# Traviss *versus* The Commonwealth.

1. The regular Spring Term of the Courts of Quarter Sessions, Oyer and Terminer and General Jail Delivery in Tioga county begins on the first Monday of May and continues for two weeks. The first week is usually devoted to criminal business, and the second to civil causes. For May Term, 1883, writs of venire were duly issued, and the jurors, grand and petit, drawn and summoned. For accommodation of counsel engaged in the Supreme Court, the court made an order on the first day of the term detaining the grand and petit jurors for service during the following week, to which the trial of causes was postponed. In obedience to this order, the jurors appeared on the second Monday of May, to which time the said several courts had been regularly adjourned. During this sitting of the grand jury an indictment for murder was found against A. At the trial his counsel moved to quash the indictment on the ground that the court had no power to detain the grand jury under the circumstances stated.

   *Held*, that the court had such power, under the Act of March 18, 1875, § 2 (P. L., 28), and that the actual bodily presence of the jurors at the time the order was made was not necessary ; the service of process upon the persons drawn gave the court jurisdiction over them. The failure of the clerk to record the order did not affect its validity, and the evidence of it was properly supplied by the entry of the order *nunc pro tunc.* The motion to quash was therefore held to have been properly refused, as was also a motion made, on substantially the same ground, in arrest of judgment.

2. A mere impression of a prisoner's guilt on the part of one called as a juror is not sufficient to disqualify him. It must appear that he has formed a fixed opinion ; and questions asked in an examination on *voir dire* must tend to elicit information on the latter point.

3. Under § 11 of the Act of March 31, 1860 (P. L., 433), objections to

[Traviss *v.* Commonwealth.]

. an indictment for formal defects apparent on the face thereof ·must be
taken by demurrer or on motion to quash before the jury is sworn.

4. A motion for a new trial was made in the above cause on the ground·
that one of the jurors who rendered the verdict was a second cousin of
the person alleged to have been murdered. and that this fact was not
. known to the defendant or his counsel until after the verdict was ren-
dered.   It also appeared that this relationship, although existing, was
· unknown to the juror until after the verdict was rendered, and that he.
had never seen the murdered woman nor heard of her except in con-
nection with the murder.
  · *Held*, that under the circumstances there was no error in refusing a
new trial.


  May 14, 1884.   Before MERCUR, C. J., GORDON, PAXSON,
TRUNKEY, STERRETT, GREEN and CLARK, JJ.
  . ERROR to the Court of Oyer and Terminer of *Tioga
county :* Of January Term, 1884, No. 3.
  Indictment of George Traviss for the murder of Martha
Sylvia.   Plea, not guilty.   The case was brought to the May
sessions of said court, 1883.
  A motion was made to quash the indictment, the grounds
for which appear in the opinion of WILLIAMS, P. J., overrul-
ing said motion, which was, inter alia, as follows :
  " The regular spring term of the several courts in this county
commences on the first Monday of May and continues two
weeks.   The first week is devoted to criminal and the second
to civil business.   For the May term last writs of venire
issued in due time, and the jurors, grand and petit, were
drawn and summoned.   But a few days before the time it was
learned that the writs of error to the courts of this judicial
district were returnable on the first Monday of May, instead
of the second Monday, as had been previously understood.
To accommodate gentlemen of the bar who were engaged in
the argument of cases before the Supreme Court, and at the
same time to secure the transaction of the business of the
criminal courts during the two weeks allotted to the May
term, orders were made on the first day of the term detaining
the grand and petit jurors for service during the following
week, to which time the trial of causes was postponed.   In
obedience to the order so made, the grand and petit jurors
presented themselves on the second Monday of May, to which
time the Courts of Oyer and Terminer, General Jail Delivery
and Quarter Sessions of the Peace had been regularly ad-
journed, and the business of the term, so far as the work of·
the grand jury and the trial of causes is concerned, was then
entered upon.
  "During the sitting of the grand jury, among other indict-
ments presented was one against the defendant in this case for.

[Traviss v. Commonwealth.]

murder. Defendant's counsel now move to quash the indictment against him, and assign reasons which assert that the court had no power to detain the grand jury under the circumstances stated, and that their action was wholly irregular and without the authority of law. . . . . .

"Our holding may be summarized as follows:

"1. The 'court' has power under the Act of 1875 (P. L. 28, § 2), to make the order under consideration, and the actual bodily presence of the jurors at the time when it is made is wholly immaterial.

"2. The 'judges' of the Criminal Courts are the sole triers of the necessity for making such order, and their decision upon the question is final and conclusive.

"3. The service of the process of the court upon the persons drawn as jurors, and not their actual presence in the court-room, gives the court jurisdiction over them, and the right to make any necessary order affecting their attendance is subject only to the qualification that they must have notice of such order before they can be held to be in contempt for not obeying it.

"4. That the failure of the clerk to record the order when made does not affect its validity. The order is the act of the court. The entry upon the minutes is only evidence of it. This evidence can be supplied by the entry of the order *nunc pro tunc* whenever the omission is brought to the attention of the court.

"5. The power so to correct its own minutes is so well settled that we should feel justified in refusing permission to the defendant to have his objection thereto filed; but, out of abundant caution and that we may save any possible right of the defendant in the premises, leave is granted to file an objection in writing to the making of the order upon the clerk to enter *nunc pro tunc* the order of May 7, 1884.

"The motion to quash the indictment in this case is overruled." (First, second, third and fourth assignments of error.)

When the case was called for trial defendant's counsel proposed to ask one James M. Roe, who was being examined on his *voir dire* as to his qualification to sit as a juror, the following question:

"You may state whether you have formed any impression of his guilt or innocence from what you have read and from what you have heard of this transaction?"

Objected to on the ground that the proper question was whether Roe had formed an opinion, not whether he had an impression.

THE COURT: "We are of opinion that the impartiality of

the juror should be determined by the legal test, which is the formation or non-formation of an opinion upon the guilt or innocence of the defendant, and that the phraseology of the question is too vague to afford any standard, if answered, by which to determine his impartiality, we exclude the question." (Fifth assignment of error).

Numerous other persons were challenged, practically, on the ground that they had impressions in regard to defendant's guilt, and the challenges were not sustained by the court. (Seventh, eighth, ninth and tenth assignments of error).

The evidence in the case was to the following effect: Martha Sylvia was seen in the village of Wellsboro up to about six o'clock in the afternoon of April 3, 1883. She lived about three miles and a half from the village, and alone. She was seen going home, after having entered upon the road which led directly toward her house. The next morning her house was found locked, and she was not there. The clock was running, but the bed appeared not to have been used during the night, and there was no fire in the stove. She was never seen or heard of afterwards alive. Upon the road along which she had to pass stood a barn, which was found to be on fire about the time she would naturally have passed it, and was wholly consumed. After the fire had somewhat abated there was discovered in the ashes an object which was supposed at the time to be the remains of some animal; but on the following morning a physician pronounced it to be the trunk of an adult woman. Upon further search in the ashes a door key was found, also a bunch of keys, a little locket, a few hairpins and buttons, and the remains of an ear-ring. It was afterwards discovered that the door key would fit the door of Martha Sylvia's house, that one of the keys on the bunch would fit her satchel and another her trunk. A small picture was also found in the house which apparently belonged in the locket.

The defendant, Traviss, was seen with Martha Sylvia on April 3, 1883, by numerous witnesses and at various times during the day. He walked along the road with her part way from her house to Wellsboro, when some one took her the rest of the way in his wagon. They were seen together in Wellsboro by several persons. Traviss called for her at a store about six o'clock in the evening. There was evidence that they were afterwards seen together in various streets and finally on the road leading toward the barn. One witness, who lived well up the road toward the barn, testified that some time after dark a man came and rapped at his door; that on opening the door he was attracted by the strange appearance and manner of the man standing there. One of them said "good evening," to which the other replied, and then the

[Traviss *v.* Commonwealth.]

stranger asked for some matches, which the witness gave him, whereupon he went away in the darkness. The witness identified Traviss as the man. Nothing was afterwards seen of Traviss until he arrived at the house of his brother-in-law, Mr. Reese—with whom he lived—a mile or more beyond the barn, some time between eight and ten o'clock in the evening. It further appeared that Traviss had agreed to buy some cattle from Martha Sylvia for $53, and when he left home in the morning he said he was going to Stokesdale to get some money which was due him from one Constant Bailey, to pay Martha for the cattle. Young Freddie Reese testified that after Traviss reached home, in the evening at supper, he said he had been to Stokesdale, and obtained the money from Bailey and paid it to Martha Sylvia. Other witnesses testified that he afterwards told them different stories about the money, and that he did not see Bailey, but had part of the money in his pocket and got the rest out of a field where he had buried it. There was evidence, however, as above set out, that he did not go to Stokesdale, but went with Martha Sylvia from her house to Wellsboro. When called upon to explain when he last saw Martha, he said he last saw her on her way to the depot; that he had paid her the money and she was going to Indiana to see her husband, from whom she had separated. The evidence, however, showed that she did not go to the train, but, on the contrary, she told certain witnesses that she was going to marry Traviss and go west with him. Although on his way home from Wellsboro he had to pass Martha's farm, where the cattle were, he did not drive them with him, but, upon a suggestion from Reese that Martha, having sold the cattle, would probably not feed them that night, Traviss, Reese and a boy went back after them. They went to Martha's house, and Traviss rapped on the door, but receiving no answer, turned to Reese and said he thought Martha had not come home. They then went to the field, took the cattle, and drove them home.

The general charge of the court was inter alia, as follows :

" There is nothing more seen of the defendant, so far as the evidence in this case shows, until he arrives at the end of his journey a mile or more beyond the barn. [He reaches the house of Mr. Reese, depending upon the conclusion the jury may arrive at from all the testimony of the witnesses, without attempting to call your attention to it particularly, somewhere from a little before eight o'clock to half-past nine." " You will remember the evidence of Mr. Boyce and Mrs. Boyce fixing the time when Reese left their house. . . . . . If he pursued the road upon which he was last seen, he passed by this barn. He passed by it at a time which *must* be not far from

being coincident with the time when the fire must have originated—when the crime must have been committed. . . . . . He passed this barn.　He passed it not far from the time the fire must have been set and *crime* committed, and he reached the other end of his journey, as we have said].　(Sixteenth assignment of error). . . . . . [On the night of the third of April, after he had reached home, according to the testimony of this same young man, Frederick Reese, while he was at supper, or before he had started after the cattle, he said to his relatives that he had been at Stokesdale; that he had been at the house of Mr. Bailey; that he had obtained from Mr. Bailey fifty-three dollars, and that he had paid to Martha Sylvia.　That is the testimony of Frederick Reese].　(Seventeenth assignment of error). . . . . . [The evidence indicates that the defendant had paid this woman; he certainly alleged he had paid her $53, the price of these cattle, that night.] (Eighteenth assignment of error). . . . . . [You can say and you must say, whether there is here any evidence of motive— whether there was money to be taken from her person, whether there were cattle to be secured, whether he had any purpose of lust to subserve, . . . . . We suggest these possible motives to you for your consideration.　They are pertinent suggestions which the jury must consider.　If the defendant committed this crime, he had a motive].　(Nineteenth assignment of error). . . . . . [Does that evidence (of defendant's previous good character)persuade you that certain other testimony, to which you might otherwise give credence, ought not to be relied upon by you, or does it raise a doubt whether you ought to rely upon it?　The depositions of two witnesses have been read, speaking of the past good character of the defendant as a peaceable man, and the testimony of his father was given before you.　You are to say how far the testimony of these three witnesses as to the previous good character of the defendant affects your belief in the other circumstances in this cause that lead to the conclusion of his guilt].　(Twentieth assignment of error). . . . . . [You have the power to fix the degree.　You have the right to find, if you find the defendant guilty, that it is murder in the second degree.　Yet we should not acquit ourselves to our consciences if we said less to you than to say that we see nothing in the testimony in this case that would justify a verdict of guilty of murder in the second degree.　We feel that we ought to say that to you, and say it in such a way as to leave no ground of mistake abut it, that in our judgment of the evidence, if it shows murder at all, it shows a murder committed with deliberation and with purpose.　This opinion is not binding upon you; but we have the right to give it to you, and we do give it to

[Traviss v. Commonwealth.]

you]. (Twenty-first assignment of error). . . . . . Now you have this case. Your question is not whether the defendant ought to be executed or not. That is not your question at all. You have nothing to do with that. Your question is: Is the defendant guilty of taking the life of Martha Sylvia? The penalty the law fixes; you do not. You are neither the makers of the law, nor are you in any proper sense the executors of it. You simply aid in administering it. [And the subordinate part assigned to you in the administration of the law in this case is to determine one question: Did the defendant in this case take the life of Martha Sylvia? You have nothing to do with anything else in connection with it.]" (Twenty-second assignment of error.)

Verdict, guilty of murder in the first degree.

The defendant's counsel moved in arrest of judgment on the following grounds:

"The indictment does not set forth that the jurors were empaneled, nor that it was found a 'true bill' by the action of twelve jurors;" "The indictment does not set forth that the grand inquest inquired in the county of Tioga, or that they were ever in Tioga county, or were of the county of Tioga;" "The jury, purporting to be a grand jury, who returned said indictment against the defendant; a true bill, was not a legal grand jury."

Defendant's counsel also moved for a new trial on the ground that "E. R. Copp, one of the jurors who rendered the verdict in this case, is second cousin to Martha Sylvia, who is alleged in the indictment to have been murdered, and that this fact was not known by the defendant or his counsel until after the rendition of the verdict in this case, viz: on the 20th of July, 1883."

The opinion of the court on both of these motions was, inter alia, as follows: "After a defendant has been arrested and before bail is given, is the proper time to make objections to the writ or the manner of its execution. After an indictment has been found, and before taking defence thereto, all proper dilatory motions and pleas are heard and determined. If the indictment remains undisposed of, the defendant may then be called upon to plead and enter upon his defence. After trial and conviction he is called upon for reasons why sentence should not be pronounced in accordance with the verdict.

"In conformity with this well considered and well settled order of procedure, objections to the form of an indictment, or to the manner in which it reached the records of the court should be taken by demurrer or upon motion to quash. If not so taken, it is too late after trial and verdict to consider them. In this case they were raised, considered and deter-

mined at the proper time, and ought now to be considered not only as belonging to an earlier stage of the case but as actually settled. . . . . . The motion in arrest of judgment is therefore refused. (Eleventh, twelfth and thirteenth assignments of error) . . . . . We have examined the facts in this case and we find that the juror was wholly ignorant of his relationship to Martha Sylvia. His judgment could not have been affected, even insensibly, by a circumstance of which he had not the slightest knowledge. If this be so, then the newly discovered relationship is no reason for setting aside the verdict. . . . . . The rule for a new trial is, therefore, now discharged." (Fourteenth assignment of error).

On July 6, 1883, the court sentenced Traviss to be hanged. Whereupon he took this writ assigning for error, the refusal of the court to quash the indictment, or to sustain his challenges of the jurors as above mentioned; the parts of the general charge set out in brackets; the refusal of the court to arrest judgment or grant a new trial, and lastly the failure of the court to charge the jury that the evidence was not sufficient to sustain a verdict against the defendant.

*Horace B. Packer*, (with whom was *Stephen F. Wilson*,) for plaintiff in error.

*Elliott & Watrous* and *Henry M. Foote*, for defendant in error.

Mr. Justice STERRETT delivered the opinion of the court, October 6, 1884.

It was of course incumbent on the Commonwealth to establish the *corpus delicti;* to prove to the satisfaction of the jury that the bones and other human remains found in the ruins of the burned building were those of Martha Sylvia; that her death was not the result of accident or any natural cause, but that she was murdered by some one at or about the time the barn was burned; and that, in the commission of the crime, the prisoner was the guilty agent. On behalf of the Commonwealth, competent evidence tending to prove each of these essential facts was adduced and with proper instructions submitted to the jury. Upon them rested the responsibility of carefully considering all the testimony and ascertaining therefrom what the facts were. Before reaching the conclusion announced by their verdict, they must have been satisfied beyond a reasonable doubt that Mrs. Sylvia came to her death neither by her own hand nor by any natural or accidental cause, but that her death was the result of unlawful violence of some kind, wilfully and maliciously inflicted on her person

[Traviss *v.* Commonwealth.]

by the prisoner. Some of the testimony tending to establish the *corpus delicti* also tended to connect the prisoner with the crime charged in the indictment. The testimony is quite voluminous, and we deem it unnecessary to refer specifically to the several items thereof bearing more or less directly on the questions involved in the issue. It is sufficient to say that it was all proper for the consideration of the jury, and, as we think, sufficient to justify them in reaching the conclusion they did. There was no error, therefore, in charging the jury as complained of in the last specification.

The subject of complaint in the first four specifications is that the grand jury by whom the indictment was passed upon and returned was not legally constituted. The record shows the regular term of the Courts of Quarter Sessions, Oyer and Terminer and General Jail Delivery for the county of Tioga began May 7, 1883, and continued for two weeks. The indictment was found and returned into the Quarter Sessions on the eighth day of the term, and was duly certified by that court into the Oyer and Terminer for trial. The grand jury was regularly drawn and summoned for the May sessions of said courts, and ordinarily they would have transacted their business during the first week of the term, but the court, for the reason stated in its special order, determined that the business of the grand jury should be transacted during the last instead of the first week of the term, and accordingly, in the exercise of its discretion, postponed the attendance of the jury until Monday of the second week, at which time they were duly organized and proceeded with the business. Being regularly drawn and summoned for the term, the grand jury were thus properly in attendance during the second week thereof, and the indictment acted on and returned during that time is neither irregular nor illegal. For the summarized reasons given by the learned president of the court in the conclusion of his opinion refusing the motion to quash, we think there was no error committed by the court in that regard, and hence the first to fourth assignments, inclusive, are not sustained.

There was no error in the ruling complained of in the fifth specification. As was said in Allison *v.* Commonwealth, 3 Out., 17, it is only when it appears the juror has formed a fixed opinion of the prisoner's guilt that he is disqualified. Mere impressions do not disqualify. The object of an examination on *voire dire* is to test the qualification of the juror by ascertaining from his own lips whether he has formed an opinion as to the guilt or innocence of the accused, and if so, whether the opinion he has formed is of such a character as to disqualify him as a juror in the case. The question that was propounded to the juror and excluded by the court was clearly

.[Traviss *v.* Commonwealth.]

improper in this, that it was not calculated to elicit such in-
formation as would be a proper test of his qualification. The
question suggested by the court was the usual and proper one.
In answer to the question whether he had formed any opinion
of the prisoner's guilt or innocence, the reply of the juror was;
"No, sir; I have probably expressed myself, as probably most
every man has, as saying that the circumstances were strong;
but I have formed no opinion that it was so." This fairly ex-
presses the substance of what was elicited by examination of
the juror on his *voire dire;* and, tested by the principles recog-
nized in Staup *v.* Com., 24 P. F. S., 458; O'Mara et al. *v.*
Com., 25 Id. 424; Ortwein *v.* Com., 26 Id., 415; Curley *v.*
Com., 3 Norris, 151, and Allison *v.* Com., *supra*, the examina-
tion failed to disclose any legal disqualification.

. The sixth specification was not pressed on argument, and
does not call for special notice. It is not sustained.

⸱ Tested by the authorities above cited, there was no error in
the rulings complained of in the seventh to tenth specifica-
tions, inclusive.

The alleged defects complained of in the eleventh and
twelfth specifications are at most merely formal. They do not
affect the merits of the case; and it is a sufficient answer to
say, the 11th Section of the Act of 1860 requires that objec-
tions to an indictment for formal defects, apparent on the face
thereof, shall be taken by demurrer or on motion to quash,
before the jury is sworn, and not afterwards: Phillips *v.* Com.,
8 Wright, 197; Com. *v.* Frey, 14 Id., 245.

The subject of complaint in the thirteenth specification is
substantially the same as that involved in the first four speci-
fications which have been already noticed. The record shows
that the indictment was duly found and returned by the grand
jury, and that they were duly sworn as such in the county of
Tioga at May sessions, 1883. Moreover, it is too late to take
advantage of a merely formal defect.

The refusal to set aside the verdict and order a new trial is ⸱
the subject of complaint in the fourteenth specification. It
appears one of the jurors by whom the verdict was rendered
was related to the person who is alleged in the indictment to
have been murdered, and the fact of such relationship was not
known to the prisoner or his counsel until after rendition of
the verdict. While it was shown to the satisfaction of the
court below that the juror's mother and the mother of the
murdered woman were cousins, and the fact was unknown to
the prisoner or his counsel at the time of trial, it was shown
with equal clearness that the juror had never seen the mur-
dered woman or heard of her except in connection with the
alleged murder, and was absolutely ignorant of any relation-

[Traviss v. Commonwealth.]

ship until several days after the verdict was rendered.   If the
fact of relationship had been known and brought to the atten-
tion of the court before the juror was sworn, he doubtless
would have been excused or successfully challenged for cause;
but it was unknown to the court as well as the counsel on both
sides, and the juror, after being examined in the usual man-
ner, was accepted and sworn.   The time to challenge is before
the juror is sworn ; if not exercised then, the right is waived.
That waiver may be relieved against when the party affected
has been intentionally misled or deceived by the juror or the
opposite party; but it is not even pretended there was any-
thing of the kind in this case.   Neither the fairness nor the
impartiality of the verdict is assailed on any ground connected
with the relationship of the juror to the murdered woman.   It
is not and cannot be pretended that he or any of his fellows
were in any manner influenced thereby.   As the learned presi-
dent of the court below well remarked, "His judgment could
not have been affected, even insensibly, by a circumstance of
which he had not the slightest knowledge."   The newly-dis-
covered relationship was, therefore, no reason for setting aside
the verdict.

The remaining specifications—fifteenth to twenty-second,
inclusive—relate to the charge of the court.   There is nothing
in either of them that requires special notice.   Viewed as a
whole, the charge was a full, clear and adequate presentation
of the case to the jury.   The case was properly submitted on
all the testimony before them, without binding instructions as
to the facts, and the prisoner has no just reason to complain
that he has not had a fair and impartial trial.   It is true the
evidence relied on by the Commonwealth was mainly circum-
stantial, but it was nevertheless competent and proper for the
consideration of the jury.   If they believed, as they doubtless
did, that the facts and circumstances of the case, as they found
them from the evidence, pointed clearly and satisfactorily to
his guilt, and were, at the same time, irreconcilable with any
other reasonable hypothesis, they were warranted in finding
as they did.   With them was the responsibility.   The court
below, being satisfied with the verdict, refused to disturb it;
and there appears to be nothing on the face of the record
before us that would justify us in reversing the judgment pro-
nounced thereon.

> The judgment of the Court of Oyer and Ter-
> miner of Tioga county is affirmed, and it is
> ordered that the record be remitted to said
> court for the purpose of execution.