# Commonwealth ex rel. Wadsworth *v.* Shortall.

*Martial law—Government—Riots—Order of governor.*

Martial law exists wherever the military arm of the government is called into service to suppress disorder, and restore the public peace.

Where the governor of the commonwealth issues a general order calling out the militia for the purpose of suppressing violence and maintaining public peace in a district affected by a strike, such an order is a declaration of qualified martial law, in the affected district. It is qualified in that it is put in force only as to the preservation of the public peace and order, and not for the ascertainment or vindication of private rights, or the other ordinary functions of government. For these the courts and other agencies of the law are still open. But within its necessary field, and for the accomplishment of its intended purpose, it is martial law with all its powers.

The resort to the military arm of the government by such an order means that the ordinary civil officers to preserve order are subordinated, and the rule of force under military methods is substituted to whatever extent may be necessary in the discretion of the military commander.

The effect of martial law is to put into operation the powers and methods vested in the commanding officer by military law. So far as his powers for the preservation of order and security of life and property are concerned there is no limit but the necessities and exigency of the situation. And in this respect there is no difference between a public war and domestic insurrection. What has been called the paramount law of self-defense, common to all countries, has established the rule that whatever force is necessary is also lawful.

While the military are in active service in the suppression of disorder and violence, their rights and obligations as soldiers must be judged by the standard of actual war.

A soldier is bound to obey an order given by his superior officer which does not expressly and clearly show on its face, or in the body thereof, its own illegality, and such order will be a protection to the soldier.

A homicide by a member of the militia called out to suppress disorder, committed without malice in the performance of his supposed duty as a soldier, and under the order of an officer, is excusable, unless it is manifestly beyond the scope of the militiaman's authority, or is such as a man of ordinary understanding would know was illegal.

The governor of the Commonwealth issued a general order calling out a division of the militia for the purpose of preserving the public peace in certain counties in which a strike of miners was taking place, and in which tumults, riots and mobs prevailed. The militia was called out, and the general in command placed a corporal's guard at a house which had been attacked with dynamite, and directed the members of the guard, if any attempt was made upon the house, or any person approached the house and failed to halt when directed, to shoot, and shoot to kill. One of the sentries, near midnight, discovered a man approaching the house, and he called upon him four times to halt. The man disobeyed the order, and the sentry shot and killed him. These facts were undisputed. The sentry was subsequently arrested on a warrant, but on habeas corpus proceedings in the Supreme Court, was released on bail. *Held*, that the relator should be discharged, inasmuch as the evidence against him failed to show a prima facie case.

Argued Jan. 5, 1903. Habeas corpus, Miscellaneous Docket 1902, No. 87, Western District, in the matter of Commonwealth ex rel. Arthur Wadsworth v. William Shortall. Before MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ.

Petition for writ of habeas corpus on behalf of the relator against respondent, a constable who had him in custody under a warrant of arrest for homicide, issued by a justice of the peace in Schuylkill County.

*Frederic W. Fleitz* and *John F. Whalen,* for commonwealth.—
The supreme executive power of the state is vested in the governor, and he has authority to execute the laws and to preserve peace and order : In re Neagle, 135 U. S. 1 (10 Sup. Ct. Repr. 650).

A homicide committed by a soldier under the orders of his superior officers has been held to be excusable in a line of cases, notably in the case of U. S. v. Clark, 31 Fed. Repr. 710, United States v. Carr, 1 Woods, 480, and McCall v. McDowell, 1 Abb. (U. S.) 212.

*M. P. McLoughlin*, district attorney, with him *George Dyson*, for respondent.

OPINION BY MR. JUSTICE MITCHELL, April 17, 1903 :

A somewhat full statement of the facts will be conducive to the proper understanding of the case.

During the summer of 1902 a strike, beginning with a labor union known as the United Mine Workers of America, spread through nearly the whole of the anthracite coal region in Pennsylvania. As time progressed it was accompanied with increasing disorder and violence on the part of the strikers and their sympathizers, so that threats and intimidation not only of men but of their women and children, rioting, bridge burning, stoning and interference with railroad trains, destruction of property and killing of non-union workmen became of frequent occurrence. The communities affected were either in secret sympathy with these acts or lacked the courage to put an end to them.

Among the places where the disorder was greatest was Shenandoah in Schuylkill county. There the police and the sheriff in attempting to preserve the peace were overpowered and beaten by mobs of strikers, and several citizens killed. The sheriff having called upon the governor, the latter first ordered out a portion of the militia and subsequently on further call, the entire division of the National Guard, on October 6, 1902, by General Order No. 39.

The text of this order which is important is as follows : "In certain portions of the counties of Luzerne, Schuylkill, Carbon, Lackawanna, Susquehanna, Northumberland and Columbia, tumult and riot frequently occur and mob law reigns. Men who desire to work have been beaten and driven away and their families threatened. Railroad trains have been delayed and stoned, and tracks torn up. The civil authorities are unable to maintain order and have called upon the Governor and Commander-in-Chief of the National Guard for troops. The situation grows more serious each day. The territory involved is so extensive that the troops now on duty are insufficient to prevent all disorder. The presence of the entire Division, National Guard of Pennsylvania, is necessary in these counties to maintain the public peace. The Major General

commanding will place the entire Division on duty, distributing them in such localities as will render them most effective for preserving the public peace. As tumults, riots, mobs and disorder usually occur when men attempt to work in and about the coal mines, he will see that all men who desire to work, and their families, have ample protection. He will protect all trains and other property from unlawful interference, will arrest all persons engaging in acts of violence and intimidation, and hold them under guard until their release will not endanger the public peace, and will see that threats, intimidations, assaults and all acts of violence cease at once. The public peace and good order will be preserved upon all occasions and throughout the several counties, and no interference whatsoever will be permitted with officers and men in the discharge of their duties under this order. The dignity and authority of the State must be maintained, and her power to suppress all lawlessness within her borders be asserted."

Under this order the 18th Regiment, being part of the troops under command of Brigadier General Gobin, was stationed in and near Shenandoah. Several houses occupied by non-union men had been dynamited and attempts made upon others. On October 8, therefore, General Gobin issued the following order: " At 5 : 30 P. M. a detail of one corporal and six men should be put at the house of Barney Bucklavage, No. 1118 West Coal street ; this house was dynamited on the night of October 6th and is occupied by a woman and four small children, and for the present I deem it best to guard it ; my instructions to the guard have been that they shall keep a sentry at the front door sitting inside the house with the door ajar, and one sentry sitting just outside the rear door under the porch, and if any attempt is made to dynamite them, or they are shot at, or stoned, or any suspicious characters prowl around, particularly in the rear of the house, who fail to halt when directed by the guard, the guard shall shoot, and shoot to kill."

The relator, Arthur Wadsworth, was a private in Company A of the 18th Regiment, in service there, and in the evening of October 8 was posted as sentry in the front yard of the Bucklavage house, just outside the door, with orders to halt all persons prowling around or approaching the house, and if the persons so challenged failed to respond to the challenge after due

warning " to shoot, and shoot to kill." About 11 : 30 o'clock he discovered a man approaching along the side of the road nearest the house and called " Halt." The man continued to advance toward the gate. Wadsworth called again " Halt." The man continued to advance. Wadsworth then touched the door and said " Corporal of the guard." He then called " Halt " and again " Halt." The man by this time had opened the gate and was coming into the yard, when Wadsworth, in accordance with his orders, fired and the man, whose name was afterwards found to be Durham, fell to the ground dead.

A coroner's inquest was held and the jury found that " the shooting was hasty and unjustifiable " and recommended that the matter be placed in the hands of the district attorney for investigation. In the meantime on complaint before a justice of the peace, a warrant had been issued for the arrest of Wadsworth, and after the return of the regiment from service he was arrested at his home in Pittsburg by the respondent, a constable of the borough of Shenandoah. A writ of habeas corpus was allowed by the presiding justice of this court, and the commonwealth not making any charge higher than manslaughter, the relator was admitted to bail, pending the argument of the case.

These are all the material facts and they are undisputed. The only appearance of question is in the testimony of some of the witnesses at the inquest that the deceased was outside the gate when they saw him after he had fallen. The relator and some others of the guard testified that the deceased had opened the gate and entered but staggered back several steps after the shot was fired.

The issue of General Order No. 39 by the governor was a declaration of qualified martial law, in the affected districts. In so characterizing it we are not unmindful of the eminent authorities who have declared that martial law cannot exist in England or the United States at all, or at least, according to the more moderate advocates of that view, not in time of peace. Thus in Ex parte Milligan, 71 U. S. 2, 127, it is said in the opinion of the majority of the court, " martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction." But in the dissenting opinion in the same case, Chief Justice CHASE convincingly

distinguished three classes of military rule, which are thus summarized by Judge HARE in his lectures on American Constitutional Law (p. 930) : " Military law, then, consists of the rules prescribed legislatively for the government of the land and naval forces, which, operating both in war and peace, and defined by Congress, are an offshoot of the civil or municipal law.   Military government is the dominion exercised by a general over a conquered State or province.   It is therefore a mere application or extension of the force by which the conquest was effected, to the end of keeping the vanquished in subjection ; and being a right derived from war, is hardly compatible with a state of peace.   Martial law is. the right of a general in command of a town or district menaced with a siege or insurrection to take the requisite measures to repel the enemy, and depends, for its extent, existence, and operation, on the imminence of the peril and the obligation to provide for the general safety.   As the offspring of necessity, it transcends the ordinary course of law, and may be exercised alike over friends and enemies, citizens and aliens."

Many other authorities of equal rank hold that martial law exists wherever the military arm of the government is called into service to suppress disorder and restore the public peace. So far as any of the questions in the present case are concerned the difference is one of terms rather than of substance and is material chiefly in regard first to the jurisdiction of courts martial or military commissions over citizens not in the military or naval service, nor engaged in recognized war, or secondly, to the responsibility of officers or soldiers giving or acting under military orders, when not in actual war, to be called to account in the civil or criminal courts.   With the first of these matters we are not now concerned, and the second will be discussed in its due order.

Order No. 39 was as said a declaration of qualified martial law.   Qualified in that it was put in force only as to the preservation of the public peace and order, not for the ascertainment or vindication of private rights, or the other ordinary functions of government.   For these the courts and other agencies of the law were still open and no exigency required interference with their functions.   But within its necessary field, and for the accomplishment of its intended purpose it

was martial law with all its powers. The government has and must have this power or perish. And it must be real power, sufficient and effective for its ends, the enforcement of law, the peace and security of the community as to life and property.

It is not unfrequently said that the community must be either in a state of peace or of war, as there is no intermediate state. But from the point of view now under consideration this is an error. There may be peace for all the ordinary purposes of life and yet a state of disorder, violence and danger in special directions, which though not technically war, has in its limited field the same effect, and if important enough to call for martial law for suppression, is not distinguishable, so far as the powers of the commanding officer are concerned, from actual war. The condition in fact exists, and the law must recognize it, no matter how opinions may differ as to what it should be most correctly called. When the civil authority, though in existence and operation for some purposes, is yet unable to preserve the public order and resorts to military aid, this necessarily means the supremacy of actual force, the demonstration of the strong hand usually held in reserve and operating only by its moral influence, but now brought into active exercise, just as the ordinary criminal tendency in the community is held in check by the knowledge and fear of the law, but the overt law breaker must be taken into actual custody.

When the mayor or burgess of a municipality finds himself unable to preserve the public order and security and calls upon the sheriff with the posse comitatus, the latter becomes the responsible officer and therefore the higher authority. So if in turn the sheriff finds his power inadequate, he calls upon the larger power of the state to aid with the military. The sheriff may retain the command, for he is the highest executive officer of the county, and if he does so, ordinarily the military must act in subordination to him. But if the situation goes beyond county control, and requires the full power of the state, the governor intervenes as the supreme executive and he or his military representative becomes the superior and commanding officer. So too if the sheriff relinquishes the command to the military, the latter has all the sheriff's authority added to his own powers as to military methods.

The resort to the military arm of the government therefore means that the ordinary civil officers to preserve order are subordinated, and the rule of force under military methods is substituted to whatever extent may be necessary in the discretion of the military commander. To call out the military and then have them stand quiet and helpless while mob law overrides the civil authorities, would be to make the government contemptible and destroy the purpose of its existence.

The effect of martial law, therefore, is to put into operation the powers and methods vested in the commanding officer by military law. So far as his powers for the preservation of order and security of life and property are concerned, there is no limit but the necessities and exigency of the situation. And in this respect there is no difference between a public war and domestic insurrection. What has been called the paramount law of self-defense, common to all countries, has established the rule that whatever force is necessary is also lawful.

"Whatever force is necessary for self-defense is also lawful. This law, applied nationally, is the martial law, which is an offshoot of the common law, and although ordinarily dormant in peace, may be called forth by insurrection or invasion. War has exigencies, that cannot readily be enumerated or described, which may render it necessary for a commanding officer to subject loyal citizens, or persons who though believed to be disloyal have not acted overtly against the government, to deprivations that would under ordinary circumstances be illegal; and he must then depend for his justification, not on the laws of war, but on the necessity which, as has been here seen, may warrant the taking of life, and will therefore excuse any minor deprivation:" Hare, Am. Constitutional Law, lect. xlii, p. 924.

"When a riot assumes such proportions that it cannot be quelled by ordinary means, and theatens irreparable injury to life or property, the sheriff may call forth the posse comitatus and exercise an authority as their chief which can hardly be distinguished from that of a general engaged in repelling a foreign enemy or subduing a revolt. Arms may be used as in battle to bear down resistance; and if loss of life ensues, the circumstances will be a justification. The measure does not, however, cease to be civil, or fall beyond the rules which apply

when a house is entered in the night by burglars, or a traveler shoots a highwayman who demands his money. Nor will it change its character because the military are called in and the sheriff delegates his authority to the commanding officer. As Lord MANSFIELD showed in the debate on the Lord George Gordon riots in 1780, soldiers are subject to the duties and liabilities of citizens, although they wear a uniform, and may, like other individuals, act as special constables or of their own motion for the suppression of a mob, and if the staff does not suffice employ the sword. The intervention of the military does not introduce martial law in the sense in which the term is understood under despotic governments, and even by some distinguished jurists, because, agreeably to the same great magistrate and the settled practice in England and the United States, they are liable to be tried and punished for any excess or abuse of power, not by the martial code, but under the common and statute law: " Hare, Am. Const. Law, lect. xli, p. 906.

This last quotation illustrates and explains the difference in the application of the term martial law which has given so much apparent trouble to some of the text writers. There is no real difference in the commander's powers in a public war and in domestic insurrection. In both he has whatever powers may be needed for the accomplishment of the end but his use of them is followed by different consequences. In war he is answerable only to his military superiors, but for acts done in domestic territory, even in the suppression of public disorder, he is accountable, after the exigency has passed, to the laws of the land, both by prosecution in the criminal courts, and by civil action at the instance of parties aggrieved. On this all the authorities agree, and the result flows from the view that martial law in this sense is merely an extension of the police power of the state, and therefore, as expressed by Judge HARE in the quotation supra, an " offshoot of the common law which though ordinarily dormant in peace, may be called forth by insurrection or invasion." See Respublica v. Sparhawk, 1 Dallas, 357, Mitchell v. Harmony, 13 How. (U. S.) 115, Ford v. Surget, 97 U. S. 594, and English cases cited in 2 Hare on Const. Law, ch. xli.

In determining the responsibility for such acts, the courts pro-

ceed upon the principle of the common law as applied in issues of false imprisonment, self-defense, etc., that the acts must be judged by the appearance of things at the time. "It is not less clear that although the justification must be based on necessity, and cannot stand on any other ground, it will be enough if the circumstances induce and justify the belief that an imminent peril exists, and cannot be averted without transcending the usual rules of conduct. For when the exigency does not admit of delay, and there is a reasonable and probable cause for believing that a particular method is the only one that can avert the danger, it will be morally necessary, even if the event shows that a different and less extreme course might have been pursued with safety:" Hare, Const. Law, p. 917.

"It is the emergency that gives the right, and the emergency must be shown before the taking can be justified. In deciding upon this necessity, the state of the facts as they appear to the officer at the time he acted will govern the decision, for he must necessarily act upon the information of others as well as his own observation. And if, with such information as he had a right to rely upon, there is reasonable ground for believing that the peril is immediate and menacing or the necessity urgent, he is justified in acting upon it, and the discovery afterwards that it was false or erroneous will not make him a trespasser:" TANEY, C. J., Mitchell v. Harmony, 13 How. 115.

And while the military are in active service for the suppression of disorder and violence, their rights and obligations as soldiers must be judged by the standard of actual war. No other standard is possible, for the first and overruling duty is to repress disorder, whatever the cost, and all means which are necessary to that end are lawful. The situation of troops in a riotous and insurrectionary district approximates that of troops in an enemy's country, and in proportion to the extent and violence of the overt acts of hostility shown is the degree of severity justified in the means of repression. The requirements of the situation in either case, therefore, shift with the circumstances, and the same standard of justification must apply to both. The only difference is the one already adverted to, the liability to subsequent investigation in the courts of the land after the restoration of order.

Coming now to the position of the relator, in regard to re-

sponsibility, we find the law well settled. "A subordinate stands as regards the application of these principles, in a different position from the superior whom he obeys, and may be absolved from liability for executing an order which it was criminal to give. The question is, as we have seen, had the accused reasonable cause for believing in the necessity of the act which is impugned, and in determining this point, a soldier or member of the posse comitatus may obviously take the orders of the person in command into view as proceeding from one who is better able to judge and well informed ; and if the circumstances are such that the command may be justifiable, he should not be held guilty for declining to decide that it is wrong with the responsibility incident to disobedience, unless the case is so plain as not to admit of a reasonable doubt. A soldier, consequently, runs little risk in obeying any order which a man of common sense so placed would regard as warranted by the circumstances : " Hare, Const. Law, p. 920.

The cases in this country have usually arisen in the army and been determined in the United States courts. But by the Articles of War (art. 59) under the acts of congress, officers or soldiers charged with offenses punishable by the laws of the land, are required (except in time of war) to be delivered over to the civil (i. e. in distinction from military) authorities ; and the courts proceed upon the principles of the common (and statute) law : 31 Fed. Repr. 711. The decisions therefore are precedents applicable here.

A leading case is U. S. v. Clark, 31 Fed. Repr. 710. A soldier on the military reservation at Fort Wayne had been convicted by court martial and when brought out of the guardhouse with other prisoners at "retreat," broke from the ranks and was in the act of escaping when Clark, who was the sergeant of the guard, fired and killed him. Clark was charged with homicide and brought before the United States district judge, sitting as a committing magistrate. Judge BROWN, now of the Supreme Court of the United States, delivered an elaborate and well considered opinion, which has ever since been quoted as authoritative. In it he said, " The case reduces itself to the naked legal proposition whether the prisoner is excused in law in killing the deceased." Then after referring to the common-law principle that an officer having custody of

a prisoner charged with felony may take his life if it becomes absolutely necessary to do so to prevent his escape, and pointing out the peculiarities of the military code which practically abolish the distinction between felonies and misdemeanors, he continued, "I have no doubt the same principle would apply to the acts of a subordinate officer, performed in compliance with his supposed duty as a soldier; and unless the act were manifestly beyond the scope of his authority, or were such that a man of ordinary sense and understanding would know that it was illegal, that it would be a protection to him, if he acted in good faith and without malice."

In McCall v. McDowell, 1 Abb. (U. S.) 212, where an action was brought by plaintiff against Gen. McDowell and Capt. Douglas for false imprisonment under a general order of the former for the arrest of persons publicly exulting over the assassination of President Lincoln, the court said, " Except in a plain case of excess of authority, where at first blush it is apparent and palpable to the commonest understanding that the order is illegal, I cannot but think that the law will excuse a military subordinate, when acting in obedience to the order of his commander, otherwise he is placed in a dangerous dilemma of being liable to damages to third persons, for obedience to the order, or for the loss of his commission and disgrace for disobedience thereto. . . . . Between an order plainly legal and one palpably otherwise there is a wide middle ground where the ultimate legality and propriety of orders depends or may depend upon circumstances and conditions, of which it cannot be expected that the inferior is informed or advised. In such cases justice to the subordinate demands, and the necessities and efficiency of the public service require that the order of the superior should protect the inferior, leaving the responsibility to rest where it properly belongs, upon the officer who gave the command." The court sitting without a jury accordingly gave judgment for Capt. Douglas, though finding damages against Gen. Mc-Dowell.

In U. S. v. Carr, 1 Woods, 480, which was a case of the shooting of a soldier in Fort Pulaski by the prisoner who was sergeant of the guard, WOODS, J., afterwards of the Supreme Court of the United States, charged the jury : " Place yourselves in the position of the prisoner at the time of the homicide. In-

quire whether at the moment he fired his piece at the deceased, with his surroundings at the time, he had reasonable ground to believe, and did believe, that the killing or serious wounding of the deceased was necessary to the suppression of a mutiny then and there existing, or of a disorder which threatened to ripen into mutiny. If he had reasonable ground so to believe, then the killing was not unlawful. But if on the other hand the mutinous conduct of the soldiers, if there was any such, had ceased, and it so appeared to the prisoner, or if he could reasonably have suppressed the disorder without the resort to such violent means as the taking of the life of the deceased, and it would so have appeared to a reasonable man under like circumstances, then the killing was unlawful. But it must be understood that the law will not require an officer charged with the order and discipline of a camp or fort to weigh with scrupulous nicety the amount of force necessary to suppress disorder. The exercise of a reasonable discretion is all that is required."

In Riggs v. State, 4 Cold. 85, the Supreme Court of Tennessee held to be correct an instruction to the jury that "any order given by an officer to his private which does not expressly and clearly show on its face, or in the body thereof, its own illegality, the soldier would be bound to obey, and such order would be a protection to him."

These are the principal American cases and they are in entire accord with the long line of established authorities in England.

Applying these principles to the act of the relator, it is clear that he was not guilty of any crime. The situation as already shown was one of martial law, in which the commanding general was authorized to use as forcible military means for the repression of violence as his judgment dictated to be necessary. The house had been dynamited at night and threatened again. With an agent so destructive, in hands so lawless, the duty of precaution was correspondingly great. There was no ground therefore for doubt as to the legality of the order to shoot. The relator was a private soldier and his first duty was obedience. His orders were clear and specific, and the evidence does not show that he went beyond them in his action. There was no malice for it appears affirmatively that he did not

know the deceased, and acted only on his orders when the situation appeared to call for action under them.   The unfortunate man who was killed was not shown to have been one of the mob gathered in the vicinity, though why he should have turned into the gate is not known.   The occurrence, deplorable as it was, was an illustration of the dangers of the lawless condition of the community, or of the minority who were allowed to control it, and must be classed with the numerous instances in riots and mobs, where mere spectators and even distant non-combatants get hurt without apparent fault of their own.

Whenever a homicide occurs it is not only proper but obligatory that an official inquiry should be made by the legal authorities.   Such an inquiry was had here at the coroner's inquest, and if there were any doubt about the facts we should remand the relator to the custody of the constable under his warrant, for a further hearing before the justice of the peace.   But there was no conflict in the evidence before the coroner, and the commonwealth's officer makes no claim here that anything further can be shown.   The facts therefore are not in dispute, and the question of relator's liability depends on whether he had reasonable cause to believe in the necessity of action under his orders.   As said by Judge HARE, citing Lord MANSFIELD in Mostyn v. Fabrigas, 1 Cowper, 161, " The question of probable cause in this as in most other instances, is one of law for the court.   The facts are for the jury ; but it is for the judges to say whether, if found, they amount to probable cause : " Hare's Const. Law, 919.

In U. S. v. Clark, 31 Fed. Repr. 710, already cited, Mr. Justice BROWN said " it may be said that it is a question for the jury in each case whether the prisoner was justified by the circumstances in making use of his musket, and if this were a jury trial I should submit that question to them . . . . but as I would, acting in (that) capacity, set aside a conviction if a verdict of guilty were rendered, I shall assume the responsibility of directing his discharge."

This court, either sitting as a committing magistrate or by virtue of its supervisory jurisdiction over the proceedings of all subordinate tribunals (Gosline v. Place, 32 Pa. 520) has the authority and the duty on habeas corpus in favor of a pris-

oner held on a criminal charge, to see that at least a prima facie case of guilt is supported by the evidence against him. In the relator's case the facts presented by the evidence are undisputed and on them the law is clear and settled. If the case was before a jury we should be bound to direct a verdict of not guilty and to set aside a contrary verdict if rendered. It is therefore our duty now to say that there is no legal ground for subjecting him to trial and he is accordingly discharged.

The relator, Arthur Wadsworth, is discharged from further custody under the warrant held by respondent.