# CHARLESTON.

HATFIELD *et al v.* GRAHAM, *Judge.*

Sumbitted February 10, 1914.   Decided March 31, 1914.

1. CONSTITUTIONAL LAW—*Due Process—Acts of Governor—Review by Court.*

The office of governor is political and the discretion vested in the chief executive by the Constitution and laws of the State respecting his official duties is not subject to control or review by the courts. His proclamations, warrants and orders made in the discharge of his official duties are as much due process of law as the judgment of a court.   (p. 764).

2. STATES—*Acts of Governor—Liability.*

The governor can not be held to answer in the courts in an action for damages resulting from the carrying out of his lawful orders or warrants issued in good faith in discharge of his official duties.   (p. 765).

3. WAR—*Governor—Power—Martial Law.*

By virtue of the authority vested in the governor by the Constitution and laws of the State, he has authority as commander-in-chief of the military forces, pending the existence of martial law covering any portion of the State's territory, to cause to be arrested and imprisoned, until peace is restored, any person whom he has good reason to believe is aiding or encouraging disorder and rioting; and he may also temporarily suppress any newspaper published in the

State, having a circulation in the martial zone, and containing articles which he has reason to believe will encourage a continuation of the disorder therein.    (p. 766).

4.   MILITIA—*Acts of Governor—Enforcement by Subordinate Officers— Civil Liability.*

A subordinate military officer is not rendered personally liable for injury resulting to private property from executing a lawful order issued by the governor as commander-in-chief of the military forces    (p. 773).

(ROBINSON, JUDGE, dissenting.)

Application for writ of prohibition by H. D. Hatfield and others against John T. Graham, Judge, and others.

*Writ Awarded.*

*A. A. Lilly,* Attorney General, *Frank Lively,* Assistant Attorney General, *Geo. S. Wallace* and *H. H. Rice,* for petitioner.

*H. W. Houston,* for respondents.

WILLIAMS, JUDGE:

H. D. Hatfield, Thomas Davis, Foster Templeton, Heber Rice and Grover Rippetoe have applied for a writ of prohibition to prohibit John T. Graham, judge of the circuit court of Cabell county, from entertaining jurisdiction of and from further proceeding in a certain action now pending in said court, brought against them by the Socialist Printing Company, a corporation.    The petition substantially avers that the Socialist Printing Company brought an action of trespass on the case in the circuit court of Cabell county against petitioners, in which it was alleged that petitioners had combined and conspired together to destroy a certain printing office owned by plaintiff, and to suppress and destroy a newspaper published by it, known as the "Socialist and Labor Star," and that in consequence of such conspiracy they did suppress and destroy said paper, thereby damaging the plaintiff to the amount of $10,000.    Petitioners further aver that, on the 2nd of February, 1914, they appeared to said action in open court and tendered and filed a special plea, verified by the affidavit of Heber Rice, one of said defendants, in which they averred "that, at the time of the alleged grievances, the said

H. D. Hatfield was, and is now governor of the State of West Virginia, and, as such, commander of the military forces thereof; that Thomas Davis, Foster Templeton, Heber Rice and Grover Rippetoe were each officers in the West Virginia National Guard holding rank as follows: Thos. B. Davis, Major, Foster Templeton and Heber Rice, First Lieutenants, and Grover Rippetoe 2nd Lieutenant; and as such subject to the orders and control of said Governor and Commander in Chief; that a state of war, insurrection and riot was and had been for a long time prior theretofore in existence in certain portions of the Counties of Fayette, Raleigh, Kanawha and Boone and recognized and proclaimed by proclamation of Wm. E. Glasscock, Governor, on the 10th day of February, 1913, and a portion of the said W. Va. National Guard then occupied said proclaimed territory; that many lives, and much property had been destroyed, and that riot and bloodshed was then rampant and pending, and that the state had spent about one-half million dollars in trying to restore peace and order, and a due execution of the laws in said proclaimed territory; that a proposition for settlement was then pending and about to be agreed to by all the contending forces in said territory and that the plaintiff, the Socialist Printing Company, was then publishing a newspaper called the 'Socialist and Labor Star' at its plant in Huntington, West Virginia, which newspaper had large circulation in the proclaimed territory and exerted great influence therein; that the plaintiff was using said newspaper unlawfully in keeping up the war, insurrection, riot and bloodshed, and counselled, aided, abetted and supported those persons therein who were at war and insurrection against the government of the State; that the issue of the said paper of the week of May 5, 1913, was especially designed to prevent a settlement of the insurrection as then proposed and about to be agreed upon, and afterwards agreed upon, and that said Governor had cause to believe and did believe that said plaintiff was combining and conspiring and supporting hostile action thereby against said state; that on the 5th day of May, 1913, said Governor issued his warrant for the arrest of the officers of said plaintiff company, and ordered that its said proposed issue of the week of May 5th, 1913, be suppressed; that in obedience to said warrant and

order, certain officers of the said plaintiff company were arrested, the said plant taken possession of on the night of May 8th, 1913, the advanced sheets of the issue of that week taken possession of and the type of said issue then set up was pied and the room in which the plant was located locked up, and said plant on the morning of the 10th of May, 1913, was returned to the possession of said plaintiff without damage except the suppression of said issue by pie-ing said type; the said defendants denied any conspiracy to destroy said plant, and denied that the same or any part thereof was destroyed.'' They allege that said special plea and all the matters therein contained are true, and exhibit a copy of it with their petition and pray that it be read and considered as a part of their petition. They further aver that on the day said special plea was filed, the plaintiff in said action appeared by counsel and moved the court to strike it from the record as not being sufficient in law, and that the court sustained the motion and struck the plea from the record, over the objections and exceptions of petitioners, and set a day for the trial of said case; that the matters set up in said special plea are true, and are admitted to be true, and that the same constitute a bar to the further prosecution of said case; that the warrant of arrest and order to suppress the issue of said paper for the week of May 5, 1913, were acts of the Chief Executive of the State fully authorized by the constitution and laws of the state for the preservation of the State; that the issuance of the same were within his discretion; that he had just cause to believe and did believe that such action was necessary; that he did in no way abuse his discretion in so doing; that said warrant and order were properly and legally carried out according to the command of said Governor by said officers as it was their duty to do under section 16 of chapter 147 of the Code; that there is nothing in said record of said case alleging an abuse of discretion or of official duty, and that there was none. Petitioners further aver that Thos. B. Davis, Heber Rice, Grover Rippetoe and Foster Templeton were at the time of the alleged commission of said grievances, officers in the lawful exercise or discharge of their official duties under an order and proclamation of the Governor of this State and are not, by express provision of law, to be held personally

responsible therefor in any action, suit prosecution or proceeding, civil or criminal; that the circuit court of Cabell county has no jurisdiction to proceed further in the trial of said case; and that, in attempting to do so, the judge of said court is exceeding and abusing his jurisdiction. And they pray that he be prohibited from further proceeding in said cause.

Upon the filing of the petition a rule was awarded, to which the Socialist Printing Company demurred and also made answer or return, and also filed an amended return. Petitioners moved to strike the return and amended return from the record on the ground that they were not responsive to the rule and also replied generally. Following the established practice of this court the motion to exclude was taken under consideration together with all matters arising upon the merits of the cause.

Respondent admits that the petition correctly sets forth the matters averred in the special plea tendered by petitioners, and that, pursuant to its motion, the court struck it out and refused to entertain it; that, at the time of the alleged grievances complained of, H. D. Hatfield was, and that he is now, Governor of the State of West Virginia, and ex officio commander-in-chief of the military forces thereof; that Thomas Davis, Foster Templeton, Heber Rice and Grover Rippetoe were then members of the military forces with the official rank claimed by them in the petition; that about the 10th of February, 1913, Wm. E. Glasscock, former governor of West Virginia, issued his proclamation placing parts of certain counties in the Kanawha coal field under martial law and that a portion of the military forces then occupied said territory; that said proclamation was in force at the time of the alleged injury; that much rioting and lawlessness existed in said territory, and that the State had spent much money in trying to restore peace and order; that the governor issued his warrant for the arrest of the officers of the respondent company, but denies that the said warrant authorized the pieing of its type, demolishing of its forms and suppressing of its newspaper, and avers that the governor at the time of issuing his warrant gave secret verbal order to the aforesaid subordinate military officers to suppress its paper, and denies

his lawful authority to give such an order and denies that the law protects his subordinate officers in obeying such an order. It also admits the pendency of a proposition for the settlement of the industrial controversy then existing between the coal operators and the miners, which had been submitted by the Governor for the mutual consideration of the contending parties, but it avers that said proposition was unfair to the miners. The record does not disclose what the proposition was. Respondent admits that, through the columns of its newspaper, it severely criticised the aforesaid proposition for a settlement, for the alleged reason that it believed that an acceptance of it by the miners would be against their best interest and a great detriment to their cause. It denies that its newspaper had great influence and large circulation in the martial zone, but admits that it had about twenty subscribers in said territory. It also avers many other matters of fact which, however, are not responsive to the writ and therefore not material for the purposes of this suit.

The material facts alleged in the petition are admitted. Therefore, the only questions presented to this court are questions of law relating to the power of the governor and the jurisdiction of the court to inquire into and pass upon the legality of his official act. Could the court retain jurisdiction of the action after the official character of the petitioners and the official act of the governor, which was the cause of the alleged injury were brought to its notice by the special plea? Should it not have entertained the plea and, no issue of fact being raised, should it not have dismissed the action for want of jurisdiction? Consistent with both reason and authority we think the questions require an affirmative answer. The declaration did not disclose the official character of petitioners, or that the alleged wrong was in consequence of an official act of the governor. Consequently, so far as it appeared upon the face of the declaration, the court had jurisdiction. It had jurisdiction of causes such as was alleged. But, when the official character of defendants, and the purpose the governor, as commander-in-chief of the military forces of the State, had in view in directing the thing to be done that is complained of in the declaration, and his good faith and honest belief in the necessity for doing it, were made

to appear by the special plea which was not replied to, the court should have dismissed the action for want of jurisdiction. The governor of the State can not be held to answer in the courts in a civil action for damages resulting from the execution of his lawful orders or warrants issued in good faith in discharge of his official duties. The Constitution and laws of the State vest in him certain powers and duties, and he is necessarily clothed with the right to determine what his duties are in any emergency; and, so long as he acts within the ·limits of his constitutional powers and privileges, his official conduct is not subject to review in any other manner than that provided by the Constitution which created his high office. Sec. 5, Art. VII of the Constitution says: ''The chief executive power shall be vested in the governor, who shall take care that the laws be faithfully executed;'' and section 12 of the same article makes him commander-in-chief of the military forces of the State, except when they are called into services of the United States, and empowers him to call them out to execute the laws, suppress insurrection and repel invasion. He has the power to declare that a state of war exists in any part of the State and to proclaim martial law for·the government of such disturbed district, and to make use of the military forces to restore peace, law and order; and his official acts in that respect are not reviewable by the courts. Nance and Mays case, 71 W. Va. 519. He is vested with the discretion to determine whether the conditions existing are such as to make it necessary to put in operation and effect the military power of the state, and having once exercised his judgment in the premises, in good faith, the courts have no power to review it and to declare his official act void. The fundamental idea underlying our federal and state systems of government is a division of powers among the three branches thereof, the executive, the legislative, and the judiciary. Every one of these is made as independent of the other two as it was thought wise and practicable by the framers of our constitutions to make them. The official acts, orders and proclamations of the chief executive, made within the scope of his constitutional powers, are no more subject to review by the courts than acts passed by the legislature. It follows from the very nature and constitution of our government, and from

the character of the powers and duties with which it has clothed the chief executive, that he must determine for himself the necessity for the exercise of such power as is vested in him. There is no higher authority in the state to determine it for him. Within his constitutional duties and powers he is supreme. Like any other officer of the state, he is liable to impeachment in the manner provided by the Constitution (Art. IV, Sec. 9) for ''mal-administration, corruption, incompetency, gross immorality, neglect of duty, or any high crime or misdemeanor.'' But there is no other manner of reviewing his official conduct. If the courts could, while the governor is in office, review his official acts and proclamations and pronounce them illegal, then the judiciary, and not the governor, would be the chief executive power in the State. But there is nothing in the Constitution investing the judiciary with power to declare void an order or proclamation which the governor has the constitutional power to make. We do not mean to intimate that a governor, because of his exalted office, is incapable of doing wrong, or that he would not be liable for wantonly, maliciously and unnecessarily injuring the person or property of a citizen. We can imagine instances wherein he might so clearly overstep the bounds of his constitutional powers as to make himself personally liable, but such instances are extremely unlikely to occur, nor does the suit now pending in the circuit court of Cabell county, which we are asked to prohibit, involve an act of that character. From the facts set up in the petition and admitted in the return a case is presented which required the exercise of executive discretion. Martial law had existed in a portion of the state for many months, and had cost the state a large sum of money. The Governor was earnestly endeavoring to restore law and order, and the means employed by him, which was the submission to the opposing forces in the industrial war a proposition of compromise for their consideration, was severely criticised. What were the terms of that proposition and the character of the criticisms which respondent had published in its newspaper, and intended to continue to publish, do not appear. But the petition alleges that their effect was to encourage a continuation of disorder and rioting in the martial zone; and that the Governor had cause to

believe and did believe that it was necessary, in order to restore peace, to suppress the publication of the issue of the paper then about to be published. Under the ordinary conditions of peace the governor could not have lawfully exercised such apparently arbitrary power, but a condition existed that amounted to domestic war, and called for the exercise of the military power of the state to suppress it. The act complained of was done in obedience to a military command of the governor, acting as commander-in-chief of the state's military forces. The necessity for the act is its justification, and the governor had the discretion to determine whether the necessity therefor existed, and having had cause to believe that the necessity did exist, the courts have no power to review his discretion and pronounce his warrant or command unlawful, as being in excess of his constitutional power. True it is that our's is a government by the people, but it must also be remembered that it is a government by laws and that the people have delegated, for the time being, their power to faithfully execute the laws to their chief executive and have, by their constitution, clothed him with the requisite power to do so. Of course, the governor must act in good faith; he can not injure the person or property of a citizen unnecessarily, wantonly or maliciously, even under color of his high office; and when his act is justifiable, as in the present case, only on the ground of public necessity, he must have reasonable ground to believe that the necessity therefor exists. But the facts constituting the grounds for his belief must be viewed from his standpoint and in the light of the exigencies as they appeared to him, because he is compelled to judge of their sufficiency in the first instance and, unless his belief is wholly unfounded, the legality of his act is unquestionable. Where there is ground for his belief the court can not substitute its judgment for his. The necessity for his act makes it both lawful and "due process" within the meaning of the Constitution of the United States. *Moyer* v. *Peabody,* 212 U. S. 78, 53 Law Ed. 410.

Respondent admits that it had twenty subscribers within the martial zone. If the paper had entered the mails the governor would have had no power to prevent its circulation in that territory, and his only course was to prevent its pub-

lication. That respondent's plant was at a point in the state remote from the martial zone did not limit his power, as the military commander-in-chief, to stop the issue of the paper which he had good reason to believe was antagonizing him and encouraging further disorder. His power, military as well as civil, is co-extensive with the boundaries of the State. A person outside of the military cordon might be able to do more mischief than one within, and it would be irrational to say that the governor has no authority to prevent it.

One's property is not more sacred in law than his personal liberty; and the Moyer case, above cited, which was an action against the governor of the state of Colorado for an alleged unlawful arrest and detention, differs from this one only in the respect that that suit was brought after the governor had ended his term of office, the injury complained of was to Moyer's personal liberty, while here the action is brought against the governor in office, and is for an alleged injury to respondent's property. In rendering the opinion in that case, Justice Holmes uses the following language: "So long as such arrests are made in good faith and in the honest belief that they are needed in order to head the insurrection off the governor is the final judge and can not be subjected to an action after he is out of office, on the ground that he had not reasonable ground for his belief." And again, he says: "When it comes to a decision by the head of the state upon a matter involving its life, the ordinary rights of individuals must yield to what he deems the necessities of the moment. Public danger warrants the substitution of executive process for judicial process." See also *In re Moyer,* 35 Colo. 159.

The case of *Commonwealth* v. *Shortall,* 206 Pa. 165, bears upon the question we are considering. There the governor issued an order calling out the militia to preserve order in certain counties in which there were mine strikes and in which tumults, riots and mobs had taken place. The general in command of the military forces had placed a guard at a home which had been attacked with dynamite, and gave them orders to shoot, and "shoot to kill," any person who approached the house at night and failed to halt when commanded to do so. A man was discovered near midnight approaching the house and was commanded four times by the sentry to halt; he did

not halt and was shot and killed by Wadsworth, the sentry. A coroners jury found the shooting was hasty and unjustifiable. He was later arrested on the charge of manslaughter, but was discharged on *habeas corpus*. The supreme court of Pennsylvania held that, "The effect of martial law is to put into operation the powers and methods vested in the commanding officer by military law. So far as his powers for the preservation of order and security of life and property are concerned there is no limit but the necessities and exigency of the situation. And in this respect there is no difference between a public war and domestic insurrection. What has been called the paramount law of self-defense, common to all countries, has established the rule that whatever force is necessary is also lawful." The court in its opinion at page 174 says: "While the military are in active service for the suppression of disorder and violence, their rights and obligations as soldiers must be judged by the standard of actual war. No other standard is possible, for the first and overruling duty is to repress disorder, whatever the cost, and all means which are necessary to that end are lawful."

Hare in his work on Constitutional Law, Lect. XLII, says: "We have seen that whatever force is requisite for the defence of the community or of individuals is also lawful. The principle runs through civil life, and has a twofold application in war,—externally against the enemy, and internally as a justification for acts that are necessary for the common defence, however subversive they may be of rights which in the ordinary course of events are inviolable. The application of the principle depends in the former case on considerations which are beyond the scope of the municipal law, and may be applied in the latter without waiting for the mandate of a court or the sanction of the legislature; although the question whether the necessity exists may be brought subsequetly before a judicial tribunal, and will be concluded by the judgment. There is to this extent due process of law, because the parties who have suffered deprivation have their day in court when the exigency has passed, and may, if there was no sufficient cause, recover compensation in damages or invoke the rigor of the criminal law."

*Marbury* v. *Madison*, 1 Cranch 49, presents the earliest

judicial utterance, in this country, respecting the right of the judiciary to pass judgment upon the official act of the chief executive; and that case is cited sometimes as authority for, and sometimes as authority against, the proposition. Marbury had been appointed by John Adams, the retiring president, as a justice of the peace in the District of Columbia. His commission had been made out and signed, but had not been delivered, by Mr. Adams. On coming into office the new president advised his secretary of state, Mr. Madison, not to deliver the commission; and Mr. Marbury applied to the Supreme Court of the United States for a writ of mandamus to compel the delivery of it. The case went off on the ground that the court was not given, by the Constitution, original jurisdiction to award the writ. But Chief Justice Marshall, who wrote the opinion, intimated that if original jurisdiction to award the writ in any case had existed, it would have been awarded in that case, for the reason that the official act of the President, so far as it involved his discretion, was completed by the signing of the commission, and that its delivery was a purely ministerial duty, to be performed by the secretary of state. But, notwithstanding the great ability of the distinguished jurist who uttered that dictum, the majority of the courts have refused to follow it, if indeed his observations can be said to relate to the president, which we do not think the learned chief justice ever intended. The relations of the president to the general government is analogous to that of the governors to their respective states, and no court in America has ever held that the judiciary has the power to control executive discretion. However, the courts of North Carolina, Ohio, Georgia, Missouri, Minnesota and Maryland have held that, if the duty is purely ministerial and such as the legislature might well have devolved on some other official, the governor may be ordered by the courts to perform it. *Cotton* v. *Ellis,* 52 N. C. 545; *State* v. *Chase,* 5 Ohio 538; (N. S. R.); *Bonner* v. *Pitts,* 7 Ga. 473; *Chamberlain* v. *The Governor,* 4 Minn. 309; *Pacific R. R.* v. *The Governor,* 23 Mo. 353; and *Magruder* v. *The Governor,* 25 Md. 173. But the better reasoned, as well as the greater number of decisions, are to the contrary. In *Hartranft's Appeal,* 85 Pa. 433, which was from an attachment issued by the court of quarter sessions

of Allegheny county to compel the attendance of the governor and certain officers of the national guard before the grand jury for the purpose of giving testimony relative to certain riots which had occurred in said county in the July preceding, in which a number of persons had been killed. The governor and his subordinate officers appeared, by the attorney general, and represented to the court, that what they knew and did, respecting the riot, they knew and had done in their official capacity as military officers; that what they knew were privileged communications and that a disclosure of them would, in their opinion, be detrimental to the public service and injurious to the interests of the Commonwealth; and disavowed any disrespect to the court and grand jury for failing to obey the court's summons. But, notwithstanding their representations, the court ordered an attachment to issue against the governor and his subordinate military officers. On appeal the supreme court of that state set aside the attachment, and, in the course of its opinion, says: ''Where does the Court of Quarter Sessions, or any other court, get the power to call this man before it, and compel him to answer for the manner in which he has discharged his constitutional functions as executor of the laws and commander-in-chief of the militia of the Commonwealth? For it certainly is a logical sequence that if the Governor can be compelled to reveal the means used to accomplish a given act, he can also be compelled to answer for the manner of accomplishing such act. If the Court of Quarter Sessions of Allegheny county can shut him up in prison for refusing to appear before it and reveal the methods and means used by him to execute the laws and suppress domestic violence, why may it not commit him for a breach of the peace, or for homicide, resulting from the discharge of his duties as commander-in-chief? And if the courts can compel him to answer, why can they not compel him to act? All these things, we know, may be done in the case of private individuals; such an one may be compelled to answer, to account and to act. In other words if, from such analogy, we once begin to shift the supreme executive power, from him upon whom the constitution has conferred it, to the judiciary, we may as well do the work thoroughly and constitute the courts the absolute guardians and directors of all govern-

mental functions whatever. If, however, this cannot be done, we had better not take the first step in that direction.''

The same doctrine was asserted by the supreme courts of Louisiana, Illinois, Rhode Island and Arkansas in the following cases, viz: *Oliver* v. *Warmoth,* 22 La. 1, 2 Am. Rep. 712; *The People ex rel.* v. *Bissell,* 19 Ill. 230; *Mauran* v. *Smith,* 8 R .I. 192, 5 Am. Rep. 564; and *Hawkins* v. *Governor,* 1 Ark. 570. 33 Am. Dec. 346; all of which were applications for mandamus to compel the governor to perform .a ministerial act imposed by statute, and in each case the writ was refused. The court of Rhode Island says: ''It is admitted that wherever, within the sphere of his duties, the executive has a discretion; he is amenable for refusing to perform them, not to the Court, but to the Senate on an impeachment, or to the people at the polls.'' Says the court of Arkansas: ''Official Acts of the Governor of the State are political and must be politically examined in the manner pointed out by the Constitution.'' And likewise the court of Louisiana: ''The Governor must be presumed to have the discretion and the right of deciding what acts his duties require him to perform otherwise his functions would be trammelled, and the executive branch of the government made subservient in an important feature to the judiciary. The right of the judiciary to interfere with or encroach upon the rights or functions of the executive is distinctly and *ex industria* disavowed.''

In *Sutherland* v. *The Governor,* 29 Mich., at page 329, Judge Cooley says: ''There is as to all the authority specially confided to the governor, whether by the constitution or the laws, no safe logical doctrine but this: that reasons of a conclusive nature must be presumed to have been found, requiring the particular authority to be confided to the chief executive as one properly and peculiarly, if not exclusively pertaining to the department which he represents.'' The court in that case declined to entertain jurisdiction notwithstanding the governor professed a willingness to be governed by the court's decision upon the merits of the case.

The above quotations show that the courts have been very careful to observe the line of demarcation separating the jurisdiction of the executive from the judiciary. The fact that the governor is vested by the Constitution and laws of

the State with power and authority to restore peace and order, in a community wherein they have been violently set at naught, clothes him with discretion, with jurisdiction, to determine the means that are necessary for the accomplishment of the end. Respondent admits that it had at least twenty subscribers in the martial zone and that it had, in a previous issue of its newspaper, severely criticised the proposition which the governor had submitted to the contending forces for a settlement of their differences. He, therefore, had reason to believe that the newspaper was lending aid and encouragement to the rioters, and he had the constitutional power and right to arrest and imprison anyone who was thus engaged and hold him in confinement until order was restored; and he likewise had power and right to prevent the publication within the state, and the circulation of newspapers in the strike zone, designed to prolong the disturbance and prevent the restoration of law and order. Having reason to believe that the exigencies of the situation justified the suppression of the paper until order was restored, the governor's action can not be reviewed by this court.

The governor's action not being reviewable by the courts, it follows necessarily that the action of the other petitioners, who are admitted to be his subordinate military officers, and to have acted in obedience to his orders, are not reviewable. It was their bounden duty to obey the lawful orders of the governor. To refuse to do so would have subjected them to punishment, certainly to a fine and, at the discretion of the court, to imprisonment. Sec. 16, Ch. 147, Code.

The fact that a part of the governor's command to his subordinate officers was not embraced in his written warrant can not affect the merits of the question. The petition alleges that what they did was done in obedience to his command. It matters not that the command was not in writing. He was acting by virtue of his military authority and it is not essential that a military officer shall give all of his commands in writing.

On the point that the refusal of the courts to entertain jurisdiction in cases like the present would leave the party complaining without remedy, Judge Cooley in the last above cited case, at page 330, says: "Practically, there are a great

many such cases, but theoretically, there are none at all. All wrongs, certainly, are not redressed by the judicial department. A party may be deprived of a right by a wrong verdict, or an erroneous ruling of a judge, and though the error may be manifest to all others than those who are to decide upon his rights, he will be without redress. A person lawfully chosen to the legislature may have his seat given by the house to another, and be thus wronged without remedy. A just claim against the state may be rejected by the board of auditors, and neither the governor nor the courts can give relief. A convicted person may conclusively demonstrate his innocence to the governor, and still be denied a pardon. In which one of these cases could the denial of redress by the proper tribunal constitute any ground for interference by any other authority? The law must leave the final decision upon every claim and every controversy somewhere, and when that decision has been made, it must be accepted as correct. The presumption is just as conclusive in favor of executive action as in favor of judicial. The party applying for action, which, under the constitution and laws, depends on the executive discretion, or is to be determined by the executive judgment, if he fails to obtain it, has sought the proper remedy and must submit to the decision.''

The want of jurisdiction was brought to the attention of the court by the special plea, and it should have dismissed the action. It did not do so but retained it for the purpose of trial, thereby exceeding its jurisdiction, and the writ will be awarded.

*Writ Awarded.*

ROBINSON, JUDGE, *(dissenting):*

This decision extends state wide the martial law doctrine heretofore by a majority of this court enunciated as to a particular, proclaimed zone. Again I dissent, consistently with my views in the former cases. 71 W. Va., pages 527 and 609.

Moreover, a new use is made of the writ of prohibition. The decision stops the trial of an action in which the declaration alleges that certain defendants maliciously trespassed on private rights guaranteed by the Constitution, simply because the defendants say the act was done by the orders of one of

them who was the Governor of the State. It prohibits the circuit court having jurisdiction to determine the fact whether the act was done maliciously, from trying that or any other issue on the declaration. The plaintiff is not allowed to be heard on its allegations that its constitutional rights have been violated, but on the other hand the word of the defendants that they violated those rights justifiably is accepted as true. The opinion, by its own dicta as well as by quotation from one of the greatest of authorities on constitutional law, admits that courts will entertain suits for damages from malicious trespasses by officials and military officers. Then, why is this action not allowed to be entertained? Though the declaration charges a malicious trespass in the plainest of terms, the presence of that charge is ignored in the majority opinion.

To stop the action by prohibition is only to deprive the plaintiff of another constitutional right—the right to a hearing before the properly constituted trial court of the fact as to whether there was malicious or unjustifiable act. The opinion concedes that the declaration states a good cause of action, yet it prohibits the allegations of malicious trespass from being tried. This court can not rightly determine the charge presented by the declaration. It has no province for original trial of an alleged wrong. The truth of the charge of the wrong should be left to the established trial court.

Certainly the Governor can not be made to answer before the courts for acts within his political province. But the declaration alleges that he committed acts wholly beyond his official powers. No Governor as such official can do a malicious act. On such a charge as the declaration contains the Governor is answerable before the trial court the same as any other citizen. The charge may there be shown to be untrue, or the act charged to be not malicious but justifiable. Still a competent trial court in which the charge is made has jurisdiction to determine whether the charge is true or the act justifiable.

The unsound principle established by this decision permits a Governor to deal with private rights and private property as he pleases. He has only to answer that he does so officially, and an action, though alleging facts showing that his act is wholly without his political province, will be prohibited. Such a view is wholly un-American, and inconsistent with constitu-

tional government. Reason and authority condemn it, and the administration of even-handed justice cries out against it.