## Commonwealth v. Weber

*H. R. Berninger,* District Attorney, for Commonwealth.

*Smith, Eves & Keller,* for defendant.

KREISHER, P. J., February 13, 1963.—Defendant was charged by a member of the Pennsylvania State Police with operating an Oldsmobile sedan on Route 11, a three-lane straight concrete and level State highway between Bloomsburg and Berwick, this county, at a speed of 65 miles per hour in violation of section 1002(b) of The Vehicle Code of April 28, 1959, P. L. 58, 75 PS §1002, which fixes the maximum speed for this type vehicle on this particular highway at 50 miles per hour. At approximately 7:50 a.m., defendant's eastern bound car was followed by the officer in an unmarked police car, which had been tested for speedometer accuracy and found accurate within a period of 30 days prior thereto, for a distance of two and one-half miles, the clocking taking place during the last half mile, after which defendant was stopped and informed of the violation.

Defendant at the time was a full-time uniformed staff officer with the rank of major in the Pennsylvania Army National Guard returning from Camp Picket,

Virginia, to Headquarters, Second Howitzer Battalion, One-hundred-ninth Artillery, Twenty-eighth Infantry Division, Wilkes-Barre, Pennsylvania. During the preceding night, the battalion convoy which consisted of 77 motor vehicles, 20 towed howitzers and 23 wheeled trailers, bivouaced on the Battlefield at Gettysburg. At 4 a.m., the lieutenant colonel in command issued defendant orders to "proceed as quickly as possible in advance of the convoy to Wilkes-Barre via civilian car. That upon reaching the Wilkes-Barre Armory, Major Weber would issue orders to remove all civilian cars from the armory vehicle storage area, the armory carral . . . and take any other action deemed necessary to prepare for the efficient and orderly arrival of the military convoy."

Defendant testifying in his own behalf states:

"I was going in a safe manner, my car under control on a straight highway. I was checking my speed all the way so that I would be within the law. I was traveling the maximum amount permissible by law."

"Q: What is that?

"A: Fifty miles per hour."

In addition to the defense of the denial, counsel for defendant cites section 841 of the Military Code of May 27, 1949, P. L. 1903, 51 PS §841, which provides:

"No officer or enlisted man shall be arrested on any warrant, except for treason or felony, while going to, remaining at, or returning from, a place where he is ordered to attend for military duty."

The information was not lodged until the day following the alleged violation. The prosecuting officer testified: ". . . I informed him what he was being stopped for, although I would make a further check as to the problems involved of a National Guard's man returning from an encampment. I found out." Objection sustained.

We could simply dispose of this case by deciding the question of the credibility of the witnesses in defendant's favor and avoid the issue raised by the above-quoted section of the Military Code. This easy solution, would not, however, be in accord with our established practice of generally upholding the integrity of our State Police in speed violation cases, as they are merely performing an unpleasant duty for our own safety without bias or prejudice. To shirk our duty on the above basis would be unfair to the many other past and future defendants appearing before this court. Therefore, we find as a fact defendant operated a motor vehicle at 65 miles per hour in a 50 miles per hour speed zone in violation of section 1002 (b) of The Vehicle Code.

This leaves us with the determination of whether or not defendant is privileged from arrest for a summary violation by reason of the above-quoted section of the Military Code.

We have been unable to find a reported Pennsylvania case in point, even though this same section was contained in the Act of May 17, 1921, P. L. 869, and listed under section 91 of the second edition of Criminal Procedure in Pennsylvania; Sadler, p. 99, wherein, it is stated inter alia:

". . . Certain limitations upon the ordinary right to arrest have been imposed by legislative enactment or judicial decision."

Examples given are members of the legislature, electors, election officers, National Guardsman and Sunday.

The absence of decisions under this statutory exemption would seem to indicate that law enforcement officers in the past have recognized this immunity.

During the first World War, a Rhode Island court held that a naval dispatch bearer under orders from his superior to proceed with dispatch in performance

of his duty was not subject to the State speed laws while traveling through Newport. The opinion does not mention a statutory exemption and is predicated upon actual hostilities giving rise to military necessity. However, at the end of the opinion, the conclusion is tempered with the admonition that a different conclusion is likely if speeding military personnel created a nuisance, or if the facts show the claimed immunity is a mere subterfuge: State v. Burton, 41 R. I. 303, 103 Atl. 962.

During the vehement 1902 anthracite coal strike in this and neighboring counties, the governor ordered out the entire division of the National Guard on October 6, and two nights later, a member guarding a house in Shenandoah which had been previously dynamited shot and killed a trespasser who failed to halt on command. The guardsman was charged with murder and on a habeas corpus petition to the Supreme Court, he was discharged on the doctrine of martial law. The exhaustive opinion of the court delivered by Mitchell, J., held, that an officer of the State militia charged with the duty of suppressing a riot cannot be punished by civil authorities for acts which, at the time, seemed necessary for the accomplishment of his commission: Commonwealth ex rel. Wadsworth v. Shortall, 206 Pa. 165. This opinion clearly demonstrates the distinctions between military law during actual conflict, martial law for actual preservation of peace and civil law during peace time. It also deals at length with the power of the State to exercise its sovereign prerogatives for the general welfare to the detriment of private rights. Therefore, it would seem to follow that the legislature possesses the power to grant the exemption here involved and, by the general wording of the act, it is applicable in peace time as well as in time of conflict without a determination of the question of necessity.

Also, under this broad power, the court need not pass upon the wisdom or reasonableness of the act, unless perhaps, as set forth in the Rhode Island case, it is used to such an extent that it becomes a public nuisance. This being one isolated case negates any such conclusion. The problem is discussed in the case of Cameron v. Civil Aeronautics Board, 140 F. 2d 482. An Army pilot flying an army plane under orders was charged with the violation of civil air regulations. There was no immunity statute involved and the court sustained the board's findings against the pilot. On page 485 of the opinion, it is stated:

"There is nothing to show that Cameron was authorized or ordered to depart from standard practice in this instance.

"Since there was no specific military order to violate a civil law or regulation here, Freeland v. Williams, 131 U. S. 405, 9 S. Ct. 763, 33 L. Ed. 193, is not applicable. After careful study of the cases in the annotation in 135 A.L.R. 37, we are of the opinion that they are also irrelevant, most of them for the same reason, i. e., they treat situations where a person in military service has been commanded to violate a civil law and been exonerated from civil liability on that account. The instant situation is far different, for petitioner's orders were to comply with the civil laws and regulations which he violated. A more persuasive analogy is presented by laws regulating the speed of motor vehicles. A person in the military service of the United States in time of war may be prosecuted for violation of such laws, where the violation was not occasioned by military necessity. See State v. Burton, 41 R. I. 303, 306, 307, 103 A. 962, 963, L.R.A. 1918F, 559. Both the Civil Air Regulations and motor traffic laws have the same objective, to minimize the possibility of accidents. In the interest of safety, common sense dictates that both Army drivers and civilian drivers, Army pilots

292

and civilian pilots, should observe the same rules where both are using the same street or airport. Here, there was no military necessity which obliged petitioner to dive below 500 feet and execute a climbing turn just above the control tower. There was no emergency."

Likewise, in the present case, defendant's orders merely told him "to proceed as quickly as possible." This did not mean exceed the speed limit. He received his orders at 4 a.m. at Gettysburg, which gave him plenty of time to get to Wilkes-Barre and carry out his commission without traveling 65 miles per hour. There was no emergency or military necessity which obligated defendant to drive as the policeman says he did, but in Pennsylvania this seems immaterial.

Our view of the act in question exempts this defendant from arrest under the facts outlined above. Any problems that might arise from our conclusion is a legislative problem and not a judicial one.

### Order of Court

And now, February 13, 1963, the above-captioned case is dismissed, the costs are placed on the county and the prothonotary is directed to return the bail posted, less his commission as allowed by law.