Commonwealth ex rel. Fletcher *v.* Cavell.

Submitted October 6, 1958. Before JONES, C. J., BELL, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Marjorie Hanson Matson,* for petitioner.

*Glenn R. Toothman, Jr.,* District Attorney, for Commonwealth.

OPINION BY MR. CHIEF JUSTICE JONES, March 20, 1959:

By this petition for a writ of habeas corpus, which is here under our original jurisdiction, the relator, James

Morris Fletcher, seeks release from his present restraint in the Western State Penitentiary where he is serving a life sentence for his conviction of murder in the first degree.

The principal contention, which the petitioner now advances, was urged upon the court below in support of his motion for a new trial following his conviction. After the new trial motion had been denied and sentence of life imprisonment, as fixed by the jury's verdict, had been imposed upon the defendant, he appealed the judgment of sentence to this court. Here, he assigned as trial error the same reasons which he had relied upon in the court below. Following argument of the appeal, we overruled the assignments of error and affirmed the judgment of sentence (*Commonwealth v. Fletcher*, 387 Pa. 602, 128 A. 2d 897). The defendant then petitioned the Supreme Court of the United States for a writ of certiorari which was denied *sub nom. Fletcher v. Pennsylvania*, 354 U.S. 913.

Fletcher's main contention in support of his petition for a writ of habeas corpus is that he was denied due process at his trial for murder, in violation of the 14th Amendment of the Federal Constitution, by not being permitted to challenge, either for cause or peremptorily, two of the sworn jurors in circumstances about to be related.

Pursuant to the trial procedure which obtains in Greene County (where Fletcher's trial was had), as well as in many other counties of the Commonwealth, a juror who has been examined on his *voir dire* and accepted by both sides is immediately sworn upon his being accepted and is not again sworn. In short, the jury, when completed, is not sworn as a body, each juror having been sworn separately.

After eight jurors had been selected and so sworn, the defendant's counsel moved the court for leave to

challenge juror number one for the reason that he was the son-in-law of a county detective who had been an investigating officer in the case, and juror number seven because of her (actually very remote) relationship to the victim of the felonious homicide for which the defendant was being tried. These matters, concerning jurors one and seven, were not known to the defendant at the time those jurors were selected and sworn. When the motion to challenge was made, the defendant had twelve peremptory challenges left. The trial judge ruled that the proposed exercise of challenges came too late and, accordingly, denied the motion. This ruling Fletcher assigned as trial error on his appeal to this court. It was then fully considered by us and rejected for the specific reason that "Since defendant made no objection to the Court's failure to discharge these jurors until after the jurors had been sworn, the verdict cannot be challenged because of any juror's disqualification . . ." In the course of our discussion of the issue thus raised by the appellant we quoted from Section 9 of the Act of May 17, 1939, P.L. 157, 17 PS §1340, just as the court below had done in denying the defendant's motion for a new trial. Section 9 provides that "After jurors are sworn without objection all objections to their qualifications as prescribed by this act or to the manner of their selection, drawing, or summoning shall be deemed to have been waived." It so happens, however, that the Act of 1939 is applicable to third class counties whereas Greene County, the venue of Fletcher's trial, is a sixth class county.

It is plain enough that the fact that the Act of 1939, supra, was not applicable to trials in Greene County was of no material moment whatsoever and does not affect in the slightest the merit of either the lower court's decision or our affirmance. The applicable common law rule of criminal procedure uniformly en-

forced throughout the State is the same as that declared by the Act of 1939, supra, for counties of the third class. The controlling rule was well stated in *Traviss v. Commonwealth,* 106 Pa. 597, 607, where the defendant was likewise appealing from a sentence imposed upon a first degree murder conviction. As there enunciated, "The time to challenge is before the juror is sworn; if not exercised then, the right is waived. That waiver may be relieved against when the party affected has been intentionally misled or deceived by the juror or the opposite party. . . ." Then followed the observation that "it is not even pretended there was anything of the kind in this case"—a circumstance that is equally the situation in the case now before us.

In *Commonwealth v. Walker,* 283 Pa. 468, 472-473, 129 A. 453, before quoting the rule as stated in *Traviss v. Commonwealth,* supra, this court declared that, "It is the duty of parties to ascertain, by proper examination at the time the jury is impaneled, the existence of any reasons for objection to the jurors. Here there was no deception by the juror or anyone as to the fact; no effort was made to elicit such information; the failure to do so and to make objection at the proper time operates as a waiver [citing authorities from various jurisdictions]." The *Walker* case was also an appeal by a defendant from a sentence imposed upon a conviction for murder in the first degree.

In *Commonwealth v. Penrose,* 27 Pa. Superior Ct. 101, 111, President Judge RICE said, after noting that, "The only remaining question that need be noticed is that which relates to the refusal of the court to grant a new trial, upon the ground, not discovered until after the trial, that one of the jurors was an alien. It is to be observed in this connection that . . . when he was drawn as a juror in the defendant's case he was accepted and sworn without being interrogated by counsel

on either side as to his qualifications . . . . [The dis-qualification] would have been disclosed, if he had been interrogated at the time he was sworn, but the defendant voluntarily omitted to avail himself of the means at his hand for informing himself and the court upon the subject. He preferred, perhaps, to hold them in reserve to be used in the event of an adverse verdict, as he had a perfect right to do, if the position of his counsel is correct. We think, however, that their position is not tenable."

Again, in *Romesberg v. Merrill,* 99 Pa. Superior Ct. 197, 200, the court said, "As stated above, the time to challenge is before the juror is sworn. If not exercised then, the right is waived. Traviss v. Com., supra; Com. v. Dombek, 268 Pa. 262; Com. v. Penrose, 27 Pa. Superior Ct. 101; Com. v. Walker, 283 Pa. 468. There was no attempt to show that there was any misconduct." The same was equally true here.

But, even if it had been permissible for the defendant to challenge for cause after the jurors had been sworn, it clearly appeared at the time of Fletcher's appeal to this court that there was no valid cause for challenging either juror number one or number seven.

In *Commonwealth v. Peronace,* 328 Pa. 86, 195 A. 57, it was held that the relationship between a juror and a county detective who was the active prosecutor in the case did not justify a challenge of the juror for cause. This fully answered the defendant's objection to juror number one who was a son-in-law of a county detective, a witness in the case. And, as to juror number seven, the relationship between her and the victim of the homicide was that of a second cousin, once removed; that she and the deceased had lived twenty-five miles apart; and that they had never visited each other during their lives.

As recognized in *Commonwealth v. Gelfi*, 282 Pa. 434, 437, 438, 128 A. 77, "The test of disqualification is the juror's ability and willingness to eliminate the influence of his scruples and render a verdict according to the evidence, and this is to be determined by the discretion of the trial judge, based upon the juror's answers and demeanor . . . . Nothing short of a palpable abuse of discretion justifies a reversal in passing on a challenge for cause. . . ." In the present case, the trial judge was most circumspect in ascertaining whether or not the two jurors whom the defendant belatedly sought to challenge were capable of rendering fairly a verdict on the evidence adduced. In deciding that they were so qualified the trial judge cannot justly be held guilty of an abuse of discretion.

In any event, the remedy of habeas corpus may not properly be used as a substitute for an appeal for the review of alleged trial errors which could have been considered and, if they were actually such, could have been corrected in the regular course of appellate review: *Commonwealth ex rel. Ashmon v. Banmiller*, 391 Pa. 141, 144, 137 A. 2d 236; *Commonwealth ex rel. Harris v. Burke*, 374 Pa. 43, 46, 96 A. 2d 909; *Commonwealth ex rel. Marelia v. Burke*, 366 Pa. 124, 126, 75 A. 2d 593; and numerous cases there cited. The fact is that in the instant case the want of due process which the petitioner alleges rests upon alleged trial error which we had reviewed on his appeal and after thorough consideration had rejected.

*Commonwealth ex rel. Penland v. Ashe*, 341 Pa. 337, 340, 19 A. 2d 464, aptly states that, " 'The writ of habeas corpus can never be used as a substitute for an appeal to test the correctness of the administration of the law in connection with a commitment [cases cited], but where such an order is beyond the power or jurisdiction of the tribunal entering it, the one thereby detained may be released on habeas corpus [cases cited].' "

In the time-honored decision in *Passmore William-son's Case,* 26 Pa. 9, 17, Pennsylvania's eminent jurist, Honorable JEREMIAH S. BLACK, in discussing the purpose of the writ of habeas corpus, enunciated the following presently significant utterance: "A *habeas corpus* is not a writ of error. It cannot bring a case before us in such a manner that we can exercise any kind of appellate jurisdiction in it. On a *habeas corpus,* the judgment even of a subordinate state court cannot be disregarded, reversed, or set aside, however clearly we may perceive it to be erroneous, and however plain it may be that we ought to reverse it if it were before us on appeal or writ of error. We can only look at the record to see whether a judgment exists, and have no power to say whether it is right or wrong."

In *Halderman's Petition,* 276 Pa. 1, 2, 119 A. 735, we pointed out that "Except in unusual cases, where the proceeding has been adopted in furtherance of the prompt administration of justice (e.g. Com. v. Shortall, 206 Pa. 165), the writ of habeas corpus can be effectively invoked here by one convicted of crime only where it appears the sentencing court was without jurisdiction (Com. v. Ketner, 92 Pa. 372), where the record shows no crime was committed, or the passing of an illegal sentence (Halderman's Case, 53 Pa. Superior Ct. 554), or where there is an improper detention of the relator after the expiration of his term of imprisonment by lapse of time or pardon."

The petitioner's additional contentions (no doubt thrown in as make-weights) verge on the trifling. He complains that the trial judge in chambers (the defendant and his counsel not being present) interrogated, briefly in fact, the juror whom the defendant had belatedly sought to challenge on the ground of her relationship to the victim. Even if questionable, the court's action in such regard could and should have been

raised on the defendant's appeal to this court. The interrogation of the juror, in the circumstances then obtaining, cannot reasonably afford a basis for a writ of habeas corpus.

The remaining complaints of the petitioner relate to two patently harmless misstatements of fact in the opinion for this court upon our affirmance of the judgment of sentence. In the one instance the opinion stated that juror number seven was between a fifth and fifteenth cousin of the victim of the homicide (one of the briefs actually so asserted) while the petitioner alleges that the relationship was that of a second cousin, once removed. Obviously, whatever the relationship was, it was remote and between two people who lived miles apart and had never visited each other. The other misstatement was that juror number one was the daughter of a county detective whereas the juror was, in fact, the son-in-law of a county detective. The original opinion for the court had accurately read,— "the husband of the daughter of a county detective" but the words "the husband of" were inadvertently omitted in the draft transcribed for filing. It is too plain for serious discussion that these mistakes of fact were manifestly unimportant and present no grounds for the granting of a writ of habeas corpus.

The petitioner implicitly concedes that the allegations whereon he seeks a writ of habeas corpus were previously considered both by the lower court and by this court in connection with his motion for a new trial. His petition alleges that, "No prior application [for a writ of habeas corpus] has been made to the Court of Oyer & Terminer of Greene County, since the issues presented herein were passed upon by that court in connection with Petitioner's Motion for a New Trial, were adjudicated adversely to him, and that action of the lower court was sustained in direct appeal by this

court in a decision reported in 387 Pa. 602, 128 A. 2d 897 (1956). The lower court being concluded by your Honorable Court's prior decision, it would have no right to grant the relief sought herein." And, neither would this court for the all-sufficient reason that the petitioner fails to aver any justifiable ground for the granting of a writ.

It is not open to dispute that the Court of Oyer and Terminer of Greene County had jurisdiction of the defendant and, likewise, of his trial on the indictment charging him with murder, and never lost jurisdiction. And, on appeal to this court, following his conviction, we, as the State court of last resort, held as a result of our review of the entire record that the trial had been conducted in strict accord with prescribed Pennsylvania procedures.

In *Ashe v. Valotta,* 270 U.S. 424, 425-426, the Supreme Court of the United States reversed an order of the District Court for the Western District of Pennsylvania granting the relator a writ releasing him from his restraint in a Pennsylvania State prison under a conviction of murder in the first degree with sentence of death. Speaking for the Court, Mr. Justice HOLMES said, "There is no question that the State Court had jurisdiction. But the much abused suggestion is made that it lost jurisdiction by trying the two indictments together. Manifestly this would not be true even if the trial was not warranted by law. But the Supreme Court of Pennsylvania has said that there was no mistake of law, and so far as the law of Pennsylvania was concerned it was most improper to attempt to go behind the decision of the Supreme Court, to construe statutes as opposed to it and to hear evidence that the practice of the State had been the other way. The question of constitutional power is the only one that could be raised, if even that were open upon this collateral at-

tack, and as to that we cannot doubt that Pennsylvania could authorize the whole story to be brought out before the jury at once, even though two indictments were involved, without denying due process of law. If any question was made at the trial as to the loss of the right to challenge twenty jurors on each indictment, the only side of it that would be open here, would be again the question of constitutional power. That Pennsylvania could limit the challenges on each indictment to ten does not admit of doubt."

It is our opinion that the petitioner's conviction, responsible for the restraint whereof he now complains, resulted from a fair and impartial trial which comported in all essential respects with applicable trial procedures and from competent evidence which fully disclosed the ingredients of first degree murder. Furthermore, we are unable to perceive wherein any federal question is involved by the relator's present petition for a writ of habeas corpus.

Petition dismissed and writ denied.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

James Morris Fletcher, the petitioner for a writ of habeas corpus in this case, was convicted in Greene County, of murder in the first degree and sentenced to life imprisonment, which he is now serving in the Western State Penitentiary. Although his conviction was affirmed by this Court in *Commonwealth v. Fletcher*, 387 Pa. 602, he has applied for relief on the ground that two of the jurors who convicted him did not wear that robe of impartiality which is assured under our system of trial by jury. One of them (juror No. 1) was a son-in-law of the county detective who conducted the investigation in the case for the Com-

monwealth, and the other juror (No. 7) was related to Gerald Tanner, the victim of the homicide.

This Court is denying the petition because it says that (1) a petition for a writ of habeas corpus may not be used as a substitute for an appeal for the review of alleged trial errors, and (2), the presence of the two alleged partial jurors did not deprive the defendant of due process of law.

I take a different view. It seems to me that if I, as a spectator, stepped into a courtroom where a murder trial was in progress and I was informed that the foreman of the jury was a son-in-law of the county detective, who perhaps was the person most interested in getting a conviction since it was upon his investigation that the prosecution was based; and I was further informed that juror No. 7 was related to the person who was killed by a shotgun allegedly fired by the defendant, I would first rub my eyes in astonishment and then I would wonder what has happened to our vaunted impartial trial by jury which we like to apostrophize in speeches at bar association conventions and at banquets offered to legal luminaries. I would also wonder, with two such interested persons on the jury, what has happened to the pristine neutrality that we always ascribe to an Anglo-Saxon jury. And if I allowed my fancies to roam I would painfully recall that in primitive times the relatives of a deceased victim were the ones who would pass judgment on the type of punishment which was to be meted out to the assumed slayer.

It seems like carrying coals to Newcastle or transporting spaghetti to Naples to say that a juror should never have a personal reason, apart from the evidence in the case, to desire a verdict for one side or the other. While much alleged levity and rather feeble attempts at humor are directed toward the family "in-law" re-

lationship, I believe that it can be stated as a fact that in the usual American family the son-in-law cherishes great respect, mingled with affection, for the father of his wife. Certainly he would have more reason to see his father-in-law triumph in a controversy than a total stranger. I am not saying that the son-in-law here, the foreman of the jury, was influenced by his marital relationship to the detective-prosecutor to the extent that he overlooked evidence favoring the defendant and emphasized the evidence supporting the prosecution. I am not saying *that,* but at the same time I am also *not* saying that he was not so influenced. And if there existed only the probability that he could have been so influenced, the defendant was unquestionably denied a fair trial.

Nor can it be argued that a case cannot be decided on probabilities. *That* is exactly what it is decided on. If it had developed that the foreman of the jury was the son of the prosecutor this Court would have no hesitancy in saying that in all probability a son would favor his father over a defendant and would grant immediate relief to the defendant, summarily dismissing any argument that the son could have been so honest and so conscientious that he would have ignored filial attachment and decided the case on merit alone.

The other alleged partial juror (No. 7), a Mrs. Nellie Barnhart, was, as I view it, even more disqualified than the foreman. She was related by blood to Gerald Tanner, whose blood, it was charged, was spilled by the defendant. The Majority Opinion derogates the degree of relationship between Mrs. Barnhart and Gerald Tanner by saying that it was too remote and that the two people "lived twenty-five miles apart; and that they had never visited each other." Relatives may indeed live miles apart (in this case the distance was 25 miles), but such distance is wiped away

when they experience a common emotional experience, whether it be one of happiness or of sorrow.

Nor can one overlook the human trait of self-aggrandizement through geographical or eventful propinquity. It is one of the weaknesses of human nature, especially where one is not educated enough to withstand the urge, to identify oneself with events and personalities which have momentarily or permanently aroused the interest of the community, state, nation, or world. If a glorious event unfolds, if a fire sweeps a block, if disaster hits a city, if a spectacular crime bursts on a community, everyone in the vicinity will consider himself a part of the happening and manage somehow to vicariously participate in the event and to heroize himself, at least to the extent of making himself a subject of enviable interest because fate has placed him in the very center of history. Who could deny to every person who lived in or near Runnymede, Waterloo, Johnstown, Appomattox or Gettysburg the right to feel himself a part of the world-shaking events which have made those towns immortal on history's page? If mere geographical affinity makes one an integral part of an event over which he has had no control, how much more would consanguinity make one part of a tragedy occurring on the family tree of which he is a living component, even if only an outspreading twig or leaf? Mrs. Barnhart was a second cousin (once removed) of the murdered Gerald Tanner but it is no empty phrase to say that blood is thicker than water.

The relationship between Mrs. Barnhart and Gerald Tanner was not ascertained until after she had been sworn, and her brother, Scott Marshall, was also called as a juror. The Commonwealth rejected Marshall for cause, but Mrs. Barnhart was allowed to remain as a juror,

The Majority Opinion says that Mrs. Barnhart and Gerald Tanner never visited each other, but this does not exclude that they knew each other and had met. This does not exclude that they had a high regard for each other as relatives. This does not exclude that Mrs. Barnhart resented and felt a revulsion against the person who was charged with slaying her second cousin, once removed, by lying in wait and blasting him into eternity.

It is my considered opinion that a person on trial for his life does not get a fair trial when it is established that the foreman of the jury trying him has a family reason to see him convicted, and that another juror may have a consanguineal axe to grind.

The Majority Opinion says that when this Court considered the case on appeal, the Court said: "Since defendant made no objection to the Court's failure to discharge these jurors until after the jurors had been sworn, the verdict cannot be challenged because of any juror's disqualification." It may be that at that time the facts were not as clear as they are now. In any event, if we erred then, there is no reason to repeat the error. It cannot, and should not, be said that there comes a time when a verdict cannot be challenged because of a juror's disqualification. It is admitted that the defendant did not know of the disqualifications in question when he was questioning the involved jurors on their voir dire, and he at once challenged for cause when he did learn of their interest.

The Majority Opinion cites the case of *Traviss v. Commonwealth*, 106 Pa. 597, 607, to the effect that "The time to challenge is before the juror is sworn; if not exercised then, the right is waived." But in the *Traviss* case the involved juror was "absolutely ignorant of any relationship [between him and the deceased victim] until several days after the verdict was

rendered." In the case at bar no such ignorance of relationship was averred or established. Moreover, the jury had not been collectively sworn when the motion for the challenge was made as to jurors Nos. 1 and 7. In *Alexander v. The Commonwealth,* 105 Pa. 1, 9, this Court said: "The trial begins when the jury is charged with the defendant, and that is at the moment a full jury is impaneled and sworn." In *Commonwealth v. Almeida,* 362 Pa. 596, 638, we said: "A jury does not come into being until it is *completely* selected and sworn."

But, over and above all this, what difference does it make when the objection to a juror's disqualification is made if, in fact, he *is*, disqualified? I don't think that if it developed that a juror had suddenly become deaf after being sworn and had then sat in on a trial for a week without hearing a word of testimony, that anyone would seriously contend that it was too late to complain about his deafness before or after verdict because he had been sworn before objection was made. The test should be whether or not the juror is really qualified, not *when* it is learned that he is disqualified. The cook who discovers, after he has cooked a dinner, that, by mistake, he used lye instead of flour, would not, or should not, insist on serving the meal merely because it would be too much trouble to re-cook it. Whatever is wrong is wrong until it is corrected. And if it is not corrected, it will remain wrong until the slate of life is wiped clean on the Great Day of Final Judgment.

In declaring that the writ of habeas corpus cannot be used to correct a trial error, the Majority Opinion says: "In the time-honored decision in Passmore Williamson's Case, 26 Pa. 9, 17, Pennsylvania's eminent jurist, Honorable JEREMIAH S. BLACK, in discussing the purpose of the writ of habeas corpus, enunciated

the following presently significant utterance: 'A *habeas corpus* is not a writ of error. It cannot bring a case before us in such a manner that we can exercise any kind of appellate jurisdiction in it. On a *habeas corpus,* the judgment even of a subordinate state court cannot be disregarded, reversed, or set aside, however, clearly we may perceive it to be erroneous, and however plain it may be that we ought to reverse it if it were before us on appeal or writ of error. We can only look at the record to see whether a judgment exists, and have no power to say whether it is right or wrong.' "

I will gladly bow to the wisdom and genius of Justice JEREMIAH BLACK, I will spare no eulogy in praising his juristic qualities, and I will step aside for no one in pronouncing him as one of the brightest adornments of the Pennsylvania judiciary for all time, but I cannot go as far as the Majority goes in intimating that when we come across a statement by Justice BLACK in the dusty tomes of the Supreme Court we must abdicate our own judgment, stifle our own independent observations, and say that once Justice BLACK has spoken there can be no room for disagreement.

I aver that here there is room for disagreement. Justice BLACK said that on a habeas corpus a judgment cannot be set aside, "however clearly we may perceive it to be erroneous." My concept of the obligation of a Supreme Court justice does not permit me to affirm anything that I perceive "to be erroneous." I believe, moreover, that we are derelict in our duty if we refuse to reverse a judgment "however plain it may be that we ought to reverse it if it were before us on appeal or writ of error." What does it matter how the question is before us, if we see the need for correction, especially when, in the present condition of the case, habeas corpus is the only avenue left open to the

defendant to reach this Court? We have authority under the powers of the King's Bench to see that justice is done, and when a man is immured in the penitentiary for life on a verdict rendered by a jury, two members of which wore beneath their robes of supposed impartiality the badge of partiality, it is our function to reverse and not to say that "we can only look at the record to see whether a judgment exists, and have no power to say whether it is right or wrong." A Court has no right to close its eyes to what is wrong. And this Court, in view of its pronouncement in *Commonwealth v. Onda,* 376 Pa. 405, 408, should be estopped from ever declaring that its library shelves are devoid of books authorizing it to act in any case where justice demands action. In that case, this Court said: "More than two centuries ago section XIII of the Act creating the Supreme Court of this Commonwealth (Act of May 22, 1722, 1 Sm. L. 131) provided that the court should 'minister justice to all persons, and exercise the jurisdiction and powers hereby granted, concerning all and singular the premises according to law, as fully and amply, to all intents and purposes whatsoever, as the Justices of the Court of King's Bench, Common Pleas, and Exchequer, at Westminister, or any of them, may or can do."

Moreover, we must consider that the statement of Justice BLACK, on which this Court relies today, was made in the year 1855. Much has happened during the last one hundred years and we cannot ignore the truism that the standards of frontier days do not always apply to the demands of a modern, complex age. Conditions alter with the passing of the years, sociological change is always with us. We no longer say that the king can do no wrong; we no longer say that a human being can be considered property (a premise accepted in the *Williamson* case); we no longer say

that under no circumstances may the Commonwealth be sued; we no longer say that a county, city, or other state subdivision cannot be held liable in tort; we no longer say that the defendant in a criminal case may not testify in his behalf because it must be assumed that he would pervert the truth to his own interest. It is certainly not a shockingly original thought to declare that times change and that the law changes with the change. It may be that the times had begun to change on the very subject under consideration when Justice BLACK wrote the opinion which this Court accepts as inviolable, for the illustrious Justice KNOX dissented from the views held by Justice BLACK.

But all this is academic and perhaps of historical interest alone, since the highest Court in the land has declared that where justice requires it, *habeas corpus* may be employed to ascertain and insure the rights of an accused. In the case of *Johnson v. Zerbst,* 304 U. S. 458, 466, the petitioner Johnson was tried and convicted in a Federal Court on the charge of counterfeiting. While serving his prison sentence, he applied for a writ of habeas corpus alleging his sentence to be illegal because he was not given, in accordance with the Sixth Amendment, the assistance of counsel at his trial. The District Court denied the writ holding that the proceedings depriving petitioner of his constitutional right to assistance of counsel were not sufficient "to make the trial void and justify its annulment in a habeas corpus proceeding, but that they constituted trial errors or irregularities which could only be corrected on appeal." The Circuit Court of Appeals affirmed, but the Supreme Court of the United States reversed, declaring in translucent and unmistakable language that: "True, *habeas corpus* cannot be used as a means of reviewing errors of law and irregularities —not involving the question of jurisdiction—occur-

ring during the course of trial; and the 'writ of habeas corpus cannot be used as writ of error'. These principles, however, must be construed and applied so as to preserve—not destroy—constitutional safeguards of human life and liberty. The scope of inquiry in *habeas corpus* proceedings has been broadened—not narrowed —since the adoption of the Sixth Amendment. In such a proceeding, 'it would be clearly erroneous to confine the inquiry to the proceedings and judgment of the trial court' and the petitioned court has 'power to inquire with regard to the jurisdiction of the inferior court, either in respect to the subject matter or to the person, even if such inquiry . . . [involves] an examination of facts outside of, but not inconsistent with, the record.' "

This decision was quoted with approval by the Superior Court in the case of *Com. ex rel. Schultz v. Smith,* 139 Pa. Superior Ct. 357, 363. I believe we should be similarly guided.

I dissent.