**UNITED STATES of America ex rel. James Morris FLETCHER, Appellant,**

v.

**Angelo C. CAVELL, Warden, Western State Penitentiary, Pittsburgh 33, Pennsylvania.**

**No. 13286.**

United States Court of Appeals Third Circuit.

Argued Oct. 20, 1960.

Decided Feb. 23, 1961.

Marjorie Hanson Matson, Pittsburgh, Pa., for appellant.

Glenn R. Toothman, Jr., Dist. Atty., Greene County, Waynesburg, Pa. (Frank P. Lawley, Jr., Deputy Atty. Gen., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellant was convicted of murder in the Court of Oyer and Terminer of Greene County, Pennsylvania in December, 1954. He was sentenced to life imprisonment. The conviction was affirmed by the Supreme Court of that state, Commonwealth v. Fletcher, 387 Pa. 602, 128 A.2d 897 and certiorari denied by the Supreme Court of the United States, 354 U.S. 913, 77 S.Ct. 1300, 1 L.Ed.2d 1429. After that he filed a petition for a writ of habeas corpus in the district court on which a hearing was allowed.

At that hearing, (October 3, 1959), it was undisputed that in the course of the selection of a jury to try the state criminal indictment a prospective juror, Paul E. Stephenson, was called for examina-

-tion. He testified that he was "perfectly impartial" as between the Commonwealth and the defendant Fletcher. He said he was free of prejudice or bias and that he could render a verdict solely from the trial evidence. He was accepted by both sides. Following Greene County practice he was immediately sworn in and seated as Juror No. 1. He was forthwith designated foreman by the presiding judge.

Another person on the jury panel, Mrs. Nellie Barnhart, examined on her voir dire, also stated she could be perfectly impartial and render a verdict solely from the evidence, without bias or prejudice. She said that she knew of nothing she had heard or read which would tend to prejudice her against the defendant. She was accepted and sworn as Juror No. 7.

As the selection of the jury continued and prior to its completion, counsel for the defense were informed (1) that Stephenson was the son-in-law of Paul Thomas, the Greene County detective who had investigated the crime and was to be a prosecution witness; (2) that Juror Barnhart was a distant relative of the deceased victim of the murder. Thomas did testify as a Commonwealth witness at the murder trial. *As found by the district court he "testified to circumstantial facts which, combined with other circumstantial evidence, undoubtedly played an important role in petitioner's (Fletcher) conviction."* (Emphasis supplied.)

The defense sought leave from the court to challenge both jurors for cause, or in the alternative, peremptorily. At that stage of the proceedings the defense had twelve unused peremptory challenges. The request was denied without a hearing.

Juror Stephenson was a witness in the district court habeas corpus hearing. He said that he was the son-in-law of Paul Thomas, having married the latter's daughter Ruth in 1947; that Thomas had been the Waynesburg Chief of Police for many years and the Greene County Detective for two years prior to the Fletcher trial; that he was on friendly terms

with his father-in-law and from January, 1951, including the period in 1954 when Thomas was investigating the murder for which Fletcher was tried, had dinner regularly at the latter's home four or five times a week; that he knew at the time Thomas was working on the Fletcher case but never discussed it with him.

Mrs. Barnhart's brother was in court regarding her. He told the district judge that his sister was seriously ill, not expected to live. He explained that their grandmother was a sister of the murder victim Tanner's great grandmother which counsel stipulated resulted in a civil law 7th degree and canon law 5th degree relationship.

The district judge concluded as to Mrs. Barnhart that her retention did not result in a denial of due process or a fair trial. He based this on what he found to be remoteness of relationship, absence of contact with Tanner or his family during his lifetime, probable unawareness of the relationship and her juror's oath.

Regarding Stephenson the district judge posed the following question:

"Whether a denial of constitutional due process has occurred where in a trial of an accused charged with first degree murder one of the jurors, who served as foreman, was the son-in-law of the chief prosecuting detective and a material witness, whose relationship was brought to the attention of the presiding judge before the selection of the jury had been completed and before trial had commenced.[3]

" [3] Juror Stephenson was the first member of the voir dire interrogated and was administered the oath as juror # 1, and was forthwith designated foreman by the presiding judge. Juror Barnhart was named juror # 7 and was the 29th member of the voir dire interrogated. It is noteworthy that upon the interrogation of 47 members of the voir dire, after eight jurors had been selected

and each administered the oath separately, defendant counsel interposed his objections to jurors Stephenson and Barnhart. He raised the objections while he continued to have 12 peremptory challenges remaining.

"At the time juror Barnhart had been approved, 16 members of the voir dire were challenged successfully for cause and 7 peremptory challenges were exercised by both the prosecution and the defense. Subsequent to the selection of juror Barnhart, and until the objections were interposed as to jurors Stephenson and Barnhart, 14 challenges for cause had been successfully made and three peremptory challenges exercised by the parties.

"A matter of considerable significance is the fact that the presiding judge excused a member of the voir dire for cause when she voluntarily stated her remote relationship to the decedent."

The court cited United States ex rel. De Vita v. McCorkle, 3 Cir., 1957, 248 F.2d 1, certiorari denied 1957, 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77, rehearing denied 1957, 355 U.S. 908, 78 S.Ct. 329, .2 L.Ed.2d 263. There a juror's failure to disclose the fact that he had been the victim of a robbery in the same area and within seven months of the one involved in the trial on which he was sitting was held to have resulted in fundamental unfairness to the defendant entitling him to a new trial. The court noted that in De Vita, " * * * the circumstances which rendered the juror biased were not disclosed until long after the trial. * * * On the other hand, in the instant proceeding, defendant counsel discovered circumstances of alleged bias relative to juror Stephenson in the course of the selection of the jury and before all the jurors had been selected and sworn."

Notwithstanding the above, the court did not formally resolve his question but continued the argument. He directed that the Commonwealth Attorney General participate therein and that briefs be filed. Following that argument (May 27, 1958), the judge, by opinion filed June 5, 1958, D.C., 162 F.Supp. 319, 323, found no substantial dispute existed between the Attorney General, the Greene County District Attorney and counsel for petitioner Fletcher that the latter's rights "under the laws and Constitution of the Commonwealth of Pennsylvania were not thoroughly presented to the Supreme Court of Pennsylvania at the time motion for new trial was argued before said court." He presented as issues not passed upon by the state tribunal:

"Where seven jurors have been selected and sworn in a criminal murder trial in the Commonwealth of Pennsylvania and while twelve peremptory challenges in behalf of the defendant remain, is it basic and fundamental error for the trial court to refuse to accept as challenge for cause or, in the alternative, to grant peremptory challenges of two jurors when the defendant has not been placed in jeopardy where—

"(a) Number One juror, being automatically the foreman in the State court, was a son-in-law of the Chief County Detective whose testimony as a State witness was of paramount importance in a case based on circumstantial evidence.

"(b) Juror Number Seven was a relative of the murder victim within the fifth degree of consanguinity.

"(c) After motion to challenge for cause or, in the alternative, to exercise a peremptory challenge as to Juror Number Seven who was a relative of the murder victim within the fifth degree of consanguinity, the trial judge interrogated said juror in his chambers and also interrogated another juror on the panel who was a brother of said juror as to relationship of the juror selected with the victim, without the presence of defendant or his counsel. Whether under the decisions and the Constitution of Pennsylvania, involving a capital offense, the accused and/or his counsel, or both, should have been

present during said inquiry when it is well recognized that the empaneling of a jury is within the purview of the constitutional safeguard. See Commonwealth v. Diehl, 378 Pa. 214, 107 A.2d 543. Prine v. The Commonwealth, 18 Pa. 103; Section 9, Article I of the Constitution of Pennsylvania."

To enable the parties to bring those questions to the state court and have them adjudicated the district judge stayed the habeas corpus action. An original petition for habeas corpus was entered in the Pennsylvania Supreme Court to which an answer was filed. Thereafter the court ruled upon the matter without oral argument or briefs and dismissed the writ. One of the seven members of the court disqualified himself as he had appeared in the district court hearing while he was Attorney General; a second was excused by reason of illness. Of the five who sat, one dissented. The majority opinion filed March 20, 1959, Commonwealth ex rel. Fletcher v. Cavell, 395 Pa. 134, states at pages 136 and 137, 149 A.2d 434, at page 436:

"After eight jurors had been selected and so sworn, the defendant's counsel moved the court for leave to challenge juror number one for the reason that he was the son-in-law of a county detective who had been an investigating officer in the case, and juror number seven because of her (actually very remote) relationship to the victim of the felonious homicide for which the defendant was being tried. *These matters, concerning jurors one and seven, were not known to the defendant at the time those jurors were selected and sworn.*" (Emphasis supplied.)

The court commented on that part of its earlier decision which had affirmed the trial court in denying a new trial because of the contention that Jurors 1 and 7 should have been disqualified. The main reason as had been stated for that affirmance was that the Act of May 17, 1939, P.L. 157 § 9, 17 P.S. § 1340, prohibits challenge to a verdict because of a juror's disqualification unless made before such juror is sworn. The court noted that the 1939 Act applied to third class counties whereas Greene County, the venue involved, is a sixth class county. However, the court upheld the same proposition as deriving from common law and uniformly enforced throughout the state. It also specifically held:

"But even if it had been permissible for the defendant to challenge for cause after the jurors had been sworn, it clearly appeared at the time of Fletcher's appeal to this court that there was no valid cause for challenging either juror number one or juror number seven."

The United States Supreme Court denied certiorari October 12, 1959, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 85. Thereafter the district court application for habeas corpus was reactivated. Briefs were filed and argument had. On May 3, 1960 the court denied the petition. In its opinion of the same date the court viewed the problem as [183 F.Supp. 338] "whether the retention of juror Stephenson was intolerable as distinguished from being unwise and undesirable. United States of America ex rel. De Vita v. McCorkle, 3 Cir., 248 F.2d 1." Immediately following that, the court said "accordingly, I have weighed the testimony of County Detective Paul Thomas most assiduously with the view to determining what weight his testimony, construed in a light most favorable to this witness, could conceivably have exerted toward tipping the scales of justice. Upon thoroughly combing the testimony in the state proceeding, together with an evaluation of the records applicable to this case, I am satisfied that said testimony, at best, was cumulative and corroborative of the testimony of State Trooper Harold A. Russell, who had *signed the information and was the Chief Investigating Officer. The record of the* state proceeding discloses that Thomas assisted Trooper Russell *in making five plaster casts of seven footprints alleged to have been made by the murderer,* and that his testimony was limited to iden-

tifying the casts and repeating the views of Trooper Russell that said casts bore a similarity to the size of defendant's footsteps. Under the circumstances Detective Thomas' role was minimal, and as such, could not, despite the retention of juror Stephenson, have resulted in such fundamental unfairness as to constitute a denial of due process of law." (Emphasis supplied).

The affirmative proposition that appellant was deprived of his right to a fundamentally fair trial under the Fourteenth Amendment to the United States Constitution is squarely before us. In our judgment the trial court's action under the particular facts in permitting Stephenson to continue as a member of the jury so clearly impinged upon the Constitutional guarantee and is so dispositive of the issue that we will deal decisionally with that branch of the appeal alone and not pass upon the Barnhart situation at this time.

 The fact that Stephenson was the son-in-law of Thomas, the Greene County detective, as noted in the last state court opinion, 395 Pa. 134, 137, 149 A.2d 434 (quoted supra) was not known to the defense when he was accepted and sworn as a juror. As soon as the defense attorneys were apprised of it they asked leave to challenge. At that time the jury had not been completed and jeopardy had not attached. Commonwealth v. Curry, 1926, 287 Pa. 553, 557, 135 A. 316. The defense had twelve peremptory challenges remaining when its request was made. The trial court denied the request, holding that by its prior acceptance of the juror, the defense had waived its right of challenge. It reiterated this conclusion on its denial for a new trial. The stated support for the decision was given as Section 9 of the Act of May 17, 1939, P.L. 157, 17 P.S. § 1340. That theory was the reason given for affirmance of the ruling by the state Supreme Court. Commonwealth v. Fletcher, 387 Pa. 602, 610, 128 A.2d 897. Later, as we have seen, this was corrected by that court in Commonwealth ex rel. Fletcher v. Cavell, 1959, 395 Pa. 134, 137, 149 A.2d 434. And the state practice, there noted as following the common law, was relied upon to justify the refusal to allow a challenge to Stephenson. As we read the Pennsylvania decisions, the all important test, applicable here, for exercise of peremptory challenges is whether jeopardy has attached. Commonwealth v. Curry, supra; Commonwealth v. Almeida, 1949, 362 Pa. 596, 636, 68 A.2d 595, 12 A.L.R.2d 183. But maintained the state court (395 Pa. at page 139, 149 A.2d at page 437) even if that were so " * * * it clearly appeared at the time of Fletcher's appeal to this court there was no valid cause for challenging either juror number one or number seven."

As matters stood then, there had existed since at least 1951 and through that part of 1954 when Thomas was investigating the homicide in question, an intimate association between Stephenson and his father-in-law. He had eaten with Thomas at the latter's home four or five days a week during those years, including from June 1954 when Tanner had been slain to December of 1954, the date of the Fletcher trial. Stephenson claimed that even in the early months of the probe into the killing and prior to any jury service, he and his father-in-law never said anything to each other regarding it. Thomas was in court at the trial, a member of the District Attorney's staff. He was a witness for the Commonwealth. He testified regarding certain footprints discovered at the scene of the killing. He, with a state trooper, had made casts of some of those prints which were accepted into evidence. The footprint evidence was most forcibly used by the District Attorney in summation to show they had been made by a man comparable to Fletcher in size and stride. *The district judge after the habeas corpus proceeding had been heard by him, found on June 5, 1958, as we have above quoted, that County Detective Thomas' * * * testimony as a state witness was of paramount importance in a case based on circumstantial evidence.*" (Emphasis supplied.)

Almost two years later, on May 3, 1960, specifically relying on the same evidence, the district judge completely reversed himself and held that Thomas' evidence was cumulative and corrobative and under the circumstances his " * * * role was minimal and as such, *could not,* despite the retention of juror Stephenson, have resulted in such fundamental unfairness as to constitute denial of due process of law." (Emphasis supplied.) The sole new element before the court was the second opinion of the state tribunal, which as we have heretofore set out, again rejected Fletcher's complaint against Stephenson and Mrs. Barnhart sitting as jurors in his trial.

In some fashion the chilling evidence under oath at the habeas corpus hearing by Stephenson seems to have been completely overlooked. The jury foreman there stated that he believed Thomas; believed what he testified. He was asked:

"Believed him (Thomas)—you believed him because you knew him didn't you?"

Stephenson's answer was "Yes". The next questions and answers were:

"Q. And you knew him because he was your father-in-law?

"A. I believed him on account of the evidence he gave.

"Q. And there was never any doubt in your mind that he was telling the truth, was there?

"A. No."

It could have been with this general thought in mind that Stephenson (as he also testified) prior to being selected as a juryman remarked, " * * * we didn't think that the defendant would accept me as a juror by being relation (stet) to him." He said he was surprised at being left on the jury. He had also said while being examined on his voir dire that he was "perfectly impartial"; was free of prejudice or bias; could render a verdict solely from the evidence adduced from the stand.

So Stephenson by his own description under oath of himself was not merely tainted with colorable or even probable bias as in United States ex rel. De Vita v. McCorkle, supra. In the face of his frankly stated attitude towards his father-in-law's evidence which pointed to Fletcher as having been at the crime scene within the critical time, it was impossible for him to believe Fletcher's alibi defense. He could not accept the Thomas and other connecting evidence inferring Fletcher was present and the latter's defense that he was somewhere else. It follows that Stephenson, sitting on that jury as its foreman, was actually biased in favor of the prosecution evidence of "paramount importance" given by Thomas. The vice of this necessarily went far beyond the Thomas testimony. State Trooper Russell testified concerning the footprints. In the last district court opinion he is referred to as the [183 F. Supp. 338] "Chief Investigating Officer" and Thomas' testimony is called "corroborative" of his evidence. This is the first time it is so styled. If this is assumed to be correct it must follow that Russell's story was necessarily held to be truthful by Stephenson. With that combination completely resolved against him by Stephenson's belief in the truthfulness of his father-in-law, Fletcher's alibi had no chance of receiving credence from him. All Stephenson did was to enter upon his duties as an impartial juror with what may have been the most vital evidence in the entire trial (the placing of Fletcher where the murder had been committed) prejudged by him in favor of his father-in-law and the latter's co-investigator and against the defendant. Even so it was nine hours before the jury agreed on a guilty verdict. And though the crime had been undeniably vicious, the verdict was for life imprisonment—not death.

█ We rest our decision on the firm ground that Stephenson in declaring himself to be impartial and without prejudice, while not revealing that he was the son-in-law of the County Detective who was one of the investigative officers in the very matter to be tried, who was to be a material witness at the trial, and whose

testimony Stephenson would believe, created an intolerable situation that resulted in a fundamentally unfair trial to appellant.[1]

Stephenson's conduct goes far beyond Kuhnle's at the trial involved in United States ex rel. De Vita v. McCorkle, supra. Kuhnle, called as a prospective juror in a trial for murder resulting from armed robbery, did not make it known that he had been an armed robbery victim within seven months of the murder and in the same area, dealing with the same police, etc. Other jurors had been queried on previous robbery experiences and Kuhnle's attention had been directed to the questions put to the previous talismen. He denied knowing any of the State's officers or personnel. We held (248 F.2d at page 8) that "The subsequently discovered undisputed facts make out a colorable bias in a juror who was a part of the verdict which caused appellant and his confederate to be sentenced to death." The De Vita decision effectively and rightly controls our course in this appeal. The problem in United States ex rel. Luzzi v. Banmiller, 3 Cir., 1957, 248 F.2d 303, differed completely from the present question. In minor aspects that case bears superficial resemblance but in essence it has no pertinence. Under the rigid test laid down in United States ex rel. Darcy v. Handy, 1956, 351 U.S. 454, 76 S.Ct. 965, 970, 100 L.Ed. 1331, cited by appellee, this appellant is not asking us to say that " * * * the mere opportunity for prejudice or corruption is to raise a presumption that they exist, * * *." What the Court called "The burden of showing essential unfairness" has been sustained by him. The record before us is somewhat voluminous but it is not at all blurred, rather it is crowded with plain injustice to appellant.

The order of the district court will be reversed.

The cause will be remanded to the district court with instructions to issue a writ of habeas corpus which will allow appellant a new trial on the merits. The writ will indicate that meanwhile, appellant is to remain in the custody of the Commonwealth of Pennsylvania.

---

1. It is argued strongly on behalf of appellant from the inference arising out of Stephenson's relationship to Thomas that the former had a substantial selfish interest in the outcome of the trial. The latter was a sensational messy affair in a small county where a murder trial itself was unusual. It was undoubtedly of importance to the prosecution, which would include the County Detective. It is suggested that for Stephenson to be completely impartial under those circumstances is to go counter to common experience. While there is considerable to be said for this thought, as we see it, there is no need of pursuing it under the circumstances before us.